HAROLD E. CRAWFORD V. THE DETERING COMPANY ET AL.

No. A-2940. Decided March 14, 1951.
Rehearing overruled April 11, 1951.
(237 S. W., 2d Series, 615.)

*Shirley M. Helm, Frank T. Abraham, Helm & Jones,* and *W. J. Kronzer, Jr.,* all of Houston, for petitioner.

The Court of Civil Appeals erred in affirming the ruling of the trial court in overruling a motion for new trial which complained that there was misconduct of the jury in receiving expert evidence from one of its members as to the length of time it would take to stop a truck on the highway, traveling a certain rate of speed, which testimony was not given to the jury from any source and was not knowledge to the public in general, and was material misconduct calculated and probably did result in an improper verdict in this cause. Akers v. Epperson, 171 S.W. 2d 483; Motley v. Mielsch, 145 Texas 557, 200 S.W. 2d 622; City of Houston v. Quinones, 142 Texas 282, 177 S.W. 2d 259.

*Butler, Binion, Rice & Cook, Frank J. Knapp,* and *Dan E. Walton,* all of Houston, for respondents.

MR. JUSTICE SMITH delivered the opinion of the Court.

This suit was filed in the District Court of Harris County by Harold E. Crawford against Herman E. Detering and Carl A. Detering, doing business as The Detering Company, to recover damages for the personal injuries alleged to have been received by Crawford as a result of a collision between a Chevrolet automobile driven by him and a truck owned by the Deterings and driven by James Debose.

The case was submitted to a jury in the district court on forty-five special issues, and, thereafter, the jury returned its verdict, which was duly received by the court. The trial court, after considering the answers of the jury to the special issues submitted, rendered judgment that plaintiff take nothing from said defendants.

In due time, the plaintiff filed his motion for new trial, alleging that while the jury was deliberating, and at a material time during its deliberations, the members of the jury were guilty of misconduct, in that at least one of the jurors related personal experiences and expert knowledge concerning a closely contested and disputed matter. The defendants filed an answer to the motion for new trial, and specially denied that any material misconduct prejudicial to the plaintiff's cause resulted during the deliberations of the jury.

The issue having been thus joined, the trial court proceeded to hear evidence thereon and at the close of the testimony overruled the motion, stating in its order that "the law is with the defendants and against the plaintiff." The trial court filed its Findings of Fact and Conclusions of Law on the issue of misconduct. The plaintiff appealed to the Court of Civil Appeals at Galveston, and that Court affirmed the judgment of the district court. 234 S.W. 2d 123.

The case is here on only one point of error, which reads as follows:

"The error of the Court of Civil Appeals in affirming the judgment of the trial court in refusing to hold the trial court erred in overruling petitioner's motion for new trial in which it was alleged that the juror, Landes, while the jury was deliberating and discussing the answer that should be given to Special Issue No. 39, testified in the presence of all the jurors as to his expert knowledge and opinion concerning the length of time it would take a bus to stop on a highway traveling at

a certain rate of speed, which testimony was not before the jury from any source and was not knowledge to the public in general, and same constituted material misconduct calculated to and probably resulting in an improper verdict in this cause."

■ Under Rule 327 of the Texas Rules of Practice and Procedure in Civil Actions, the plaintiff in this case was required to show, in order to obtain a new trial upon the grounds of jury misconduct that (a) the misconduct complained of in fact occurred, (b) it was material, and (c) it was calculated to and probably did result in harm to him.

Eleven of the jurors testified on the motion for new trial, and their testimony on the issue of jury misconduct is fairly reflected in the findings of fact filed by the trial court, which are as follows:

"1. The jury went out about 2:30 P.M., on January 30, 1950.

"2. They were dismissed that night about 10:00 o'clock P.M., and returned the next morning at 8:30 A.M.

"3. Shortly before noon on the 31st of January, 1950, the jury was attempting to answer Special Issue No. 39. At that time they had answered Special Issues Nos. 35, 36, 37 and 38 in the affirmative to the effect that from the preponderance of the evidence the defendants' truck driver, immediately before the collision in question, turned his said truck into the center lane of the highway at a time when the plaintiff was in a position of peril, and that said truck driver discovered plaintiff in a position of peril and realized that plaintiff could not and in reasonable probability would not be able to extricate himself from such position of peril.

"4. The jurors discussed at some length Special Issue No. 39, as contained in the court's charge, inquiring of the jury whether the driver of the defendant's truck discovered and realized the plaintiff's position of peril in time to have avoided the accident in question with the use of the means at hand, commensurate with his own safety and the safety of his vehicle, but were unable to agree.

"The jury had taken two votes on Special Issue No. 39 and stood nine to three in favor of answering the issue 'No.'. Jurors C. E. Putnan, Herbert L. Mertz and M. C. Doan had voted that Special Issue No. 39 should be answered 'Yes.'

"5. At this stage of their deliberation, and while the jurors were awaiting to go out to lunch, one or more of the jurors

turned to Mr. M. E. Landes, who was known to be a bus driver by occupation, and asked Mr. Landes how long it takes to stop a bus.

"6. Mr. Landes, in response to the inquiry, told about some tests which his Bus Company employer made to test mental reactions of prospective employees. He stated that two sulphur guns would be placed on the bumper of the bus and after it had attained a speed of more than 30 miles per hour, a passenger would pull a string and explode one of the guns, which would leave a mark on the pavement. The explosion would also be a signal for the bus driver to try to stop the bus. When an application of the brakes was made, the second gun would explode automatically, thus making another mark on the pavement. The distance between the marks on the pavement and the place where the bus would come to a stop would indicate the reaction time of the driver and also the distance it would take to stop the bus. Landis made the statement: 'You would be surprised how far it takes a bus to stop.' He also stated that a bus had air-brakes and can stop quicker than a truck, which has hydraulic brakes.

"7. The discussion by Mr. Landes took about three minutes, and shortly thereafter the jury went to lunch.

"8. Upon their return from lunch the jury, after some further discussion, voted again on Issue No. 39 and answered unanimously in the negative."

■ Having read the testimony of the eleven jurors and the findings of fact set out above, we hold that such evidence and findings of fact conclusively show that the statement made by the juror, Landes, actually occurred before the jury answered Issue No. 39.

In order to determine the question of whether the statement of juror, Landes, constituted misconduct of a material nature and that probably injury resulted to plaintiff, we deem it necessary to look to the entire record as well as the evidence introduced on the motion for new trial.

Plaintiff testified that on February 10, 1949, he was driving a Chevrolet automobile on the Houston-Baytown Road; that it was a three-lane highway; that he was traveling in an easterly direction at a speed of around fifty-five miles per hour; that he kept his car in the south lane and while in said lane he could see another car ahead traveling in the same direction; that he gradually overtook this car and when he was about fifty feet behind it, he turned his car into the center lane, which was

clear and unobstructed; that he was some 200 or 300 yards from the scene of the accident when he started to pass; that his front bumper was about even with the door of the car he was passing when the collision occurred; that he had been in the middle lane for some three or four minutes, and that the road was clear ahead of him when he entered the middle lane; that he saw a car and a truck some distance ahead of him traveling in a westerly direction and that both vehicles were in the north lane; that the truck was at least one hundred yards behind the car when he first saw it; that the road was straight from the point where he turned into the center lane to the point where the car and truck were when he first saw them and that he had a clear view ahead of him; that the truck gained on the car ahead of it and that as the truck got up to the car, the driver of the truck, without warning, turned it into the center lane; that he was about 50 feet from the truck when it came into the center lane.

The defendants, through their driver, relate an entirely different version.

James Debose, the driver, testified that he was driving about 30 miles per hour as he approached where the accident later happened; that the car which had been ahead of him pulled off on the shoulder of the road and stopped, and that he did not have to pull over into the center lane to pass it; that just before the collision, plaintiff's car suddenly came from behind the car ahead of him and swerved and went into a skid; that he, Debose, put on his brakes and began trying to get off the highway; that the Chevrolet driven by plaintiff ran into his truck while his truck was partly on the north lane and partly off the pavement on the north side.

He further testified that he saw plaintiff's car coming when it was some 200 or 210 feet away, and that he saw it was in trouble because it was swerving; that he turned his truck to the right and put on his brakes, and that he had practically stopped when plaintiff's car hit him; that "I stopped it right there dead."

Then, he further testified: "You can not stop right dead still with no truck or no car, you can't stop right dead still, you have to have a little time for your brain to react to get to your brakes, then it takes thirty or forty feet to stop. You can't bring a truck to a dead still, to a stop, driving at a rate of thirty miles an hour."

"No, sir, because it takes me a little while, maybe fifteen or twenty feet, before I could get on my brakes to stop."

As to the question of the position of the car and truck involved in this accident, the jury, in answer to Special Issue No. 1, made its finding that the plaintiff, at the time and immediately before the collision, was operating his car *in the center lane of the highway in the act of passing another vehicle proceeding in the same direction.* (Emphasis added.)

In answer to Special Issue No. 2, the jury made its finding that the defendant's truck driver, *immediately before the collision in question turned said truck into the center lane of the highway when it was occupied by the plaintiff's automobile.* (Emphasis added.)

The jury accepted plaintiff's version on these two important questions. However, the jury found the defendant driver guilty of no acts of primary negligence, and petitioner, Crawford, guilty of no acts of contributory negligence.

■ We shall now turn to the issues of discovered peril. The plaintiff's pleadings raised the issue, and the trial court, after hearing the pleadings and the evidence, submitted the Special Issues Nos. 36, 37, 38 and 39, all relating to the issue of discovered peril. We have examined the transcript before us and fail to find any objection on the part of the defendants to the submission of these issues. However, in view of the evidence in this case, we believe the trial court was correct in submitting the issue of discovered peril to the jury for its consideration. Vontsteen v. Rollish, 133 S.W. 2d 589.

In answer to Issues Nos. 36, 37 and 38, the jury made its findings of fact (a) that plaintiff was in a position of peril prior to the collision; (b) that defendant's driver discovered the plaintiff in such position of peril prior to the collision; (c) that after making such discovery, the truck driver realized that plaintiff could not and in reasonable probability would not be able to extricate himself from such position of peril.

■ The jurors discussed at some length special issue No. 39. Two votes were taken and each time the vote was nine to three in favor of answering the issue "No." The jury was dead-locked until the juror Landes, in response to a question propounded by one of the jurors, gave his personal experience and expert

knowledge, as set out above. Prior to this occurrence the jurors had confined their deliberations to the evidence introduced in the trial of the case. The evidence legally before the jurors was, in our opinion, sufficient to authorize the court to submit the issue involving the element of "time" to the jury.

■ This was a closely contested issue, but according to defendant's testimony, their truck driver could have discovered the perilous position of Crawford when he was a distance of 200 or 210 feet away. James Debose testified that Crawford was at least that distance when he saw him swerving his car and saw that he was in trouble. By this testimony, the defendant does fix a distance sufficient that he could have discovered the perilous position of Crawford in time to have avoided the collision. According to the evidence and the answer of the jury to Special Issue No. 1, the plaintiff was in the center lane in the act of passing another vehicle, and the jury further found that the defendant's driver turned into the center lane while it was occupied by plaintiff, Crawford.

This vital issue should have been answered from a preponderance of the evidence introduced in open court. The fact that juror, Landes, did not give any measurements, time or distance, does not remove the harmful effects of his testimony. He stated that he did not give such facts because of the element of reaction time, but he did state that "you would be surprised how far it takes a bus to stop," and that it required a longer time to stop a truck than a bus.

This statement of the juror, Landes, came at a time after the jurors had entered into and ended an exhaustive discussion of the evidence before it and had been unable to reach an agreement.

The evidence in this case reflects that the driver of defendant's truck was about 50 years of age; he testified that it took him about 15 or 20 feet to react and apply the brakes. Juror, Landes, related his test and stated "the distance between the marks on the pavement and the place where the bus would come to a stop would indicate the reaction time of the driver, and also the distance it would take to stop the bus." It is entirely possible that the jurors, after hearing the testimony, could have decided that the 50-year old truck driver underestimated his reaction time.

■ Respondents contend that the matters related by juror

Landes, were of common knowledge, and were general in nature. With this contention, we cannot agree. He related a test that was unknown by the other jurors with the possible exception of one. The others testified that they had never heard of such a test. The jurors recognized Mr. Landes to be a person with specialized training, otherwise they would not have turned to him for information. If it were a matter of common knowledge, then no one should be surprised or amazed.

Since the plaintiff met the burden which rested upon him on his motion for new trial and that same should have been granted, the judgment of the trial court and the Court of Civil Appeals is reversed and the cause is remanded to the district court for another trial.

Opinion delivered March 14, 1951.

MR. JUSTICE WILSON dissenting.

I respectfully dissent from the decision of the majority for the reason that the remarks of the juror were immaterial. I will refer to the parties as they were designated in the trial court.

There were two radically different, conflicting and mutually exclusive fact theories submitted to the jury in this case. The plaintiff's theory was that he was driving away from Houston and turned first into the center lane of a three-lane highway for the purpose of passing a car traveling in front of him in the same direction. After plaintiff was in the center lane of the three-lane highway, the defendant's truck driver coming from the other direction (driving toward Houston) attempted to pass a car traveling toward Houston in front of the truck. The plaintiff testified that defendants turned into the center lane directly into the path of plaintiff resulting in a head-on collision. The defendants' version of the facts was that plaintiff was attempting to pass a car traveling in his direction (away from Houston) and in so doing made a quick turn into the center lane and lost control of his car. Defendants contend that plaintiff's car skidded sideways across the road into defendants' truck which was not trying to pass anything but was attempting to get off the road on its side of the road. Plaintiff says that there were four cars at or near the scene of the impact while defendants' truck driver said there were only three. Plaintiff says that the basic cause of the wreck was defendants' truck driver "whipping" out from behind a fourth car in an effort to pass it and entering the center lane when it was not clear, while defendants' truck driver

says that the basic cause of the wreck was plaintiff losing control of his car and skidding across the highway into the truck which was on its own side of the road and not passing anything.

Had the jury adopted defendants' basic fact theory of the case, discovered peril may have been a possible issue in the case. Defendants' truck driver testified that he discovered that plaintiff's car was out of control when plaintiff was at a maximum distance of 210 feet from him. Even under this theory, however, I doubt that the proof raised discovered peril based on the use of the truck brakes as the "means at his command", because the record is silent on the braking-distance of this particular truck or a similar make and model truck under similar circumstances except for the testimony of the truck driver which probably does not raise it. However, the jury adopted plaintiff's theory of the case in answering Issues Nos. 1, 2, 5, 16, 20, and 35. These issues on primary negligence were so framed that before they could be answered the jury must decide upon one or the other sets of facts. After they decided for plaintiff's version, discovered peril went out of the case altogether for the very reason the jury found in answering Special Issue No. 39: i. e., the discovery *was not in time* to avoid the accident.

In Northern Texas Traction Co. v. Weed, Com. App. Opinion adopted by the Sup. Ct., 300 S. W. 41, the court said:

"The vital and controlling issue in every case of discovered peril is whether the perilous position of the injured party is discovered in time to avoid the injury by the use of all the means at hand. In nearly all cases of injury there is a discovery of the danger at some point prior to the injury, and the crucial issue is the time of discovery."

To merely state plaintiff's contention is to demonstrate that the doctrine or discovered peril could not apply to his version of the facts. Four cars approached the point of impact. The plaintiff, following a car driving away from Houston, attempted to pass it and turned into the center lane for that purpose. The defendants' truck, following a car driving toward Houston, attempted to pass that car and turned into the center lane for that purpose. The highway was straight and level. At the time the truck turned into the center lane, he was "roughly fifty feet" from plaintiff and going about 50 miles an hour according to plaintiff but 30 miles an hour according to the truck driver. Plaintiff was driving about 55 miles an hour. At the time of the impact, plaintiff's front bumper had reached the door handle of the car he was passing. Under these circumstances, the peril

did not arise until the truck turned into the center lane, and at that time no application of brakes could have prevented the collision.

The two vehicles were in a "chute" moving toward each other and the accident was inevitable. One witness testified that the plaintiff's car "reared up on its hind legs" and that all four wheels left the ground and it fell to the ground facing back towards Houston.

Plaintiff himself testified and graphically described his version of the accident as follows:

"Well, as I was going down this highway on this straight stretch, I pulled out and as my bumper had got even with the car to my right that I was about to pass, as my front bumper got even with his door, about, then this car on my left coming towards me was on his side and the truck was behind him coming pretty rapidly behind him, and as this truck got up to this car, well, without doing anything, the car must have slid up or something, he just wheeled right out in the center lane and when he did, I just had time to throw on my brakes, I could not go to the left or to the right in fear of running into the car that was coming into me—I threw on the brakes and all four wheels just started sliding right in the middle lane and it happened like that (snapping fingers). I was thrown out on the ground—I don't know how long I had been out, but it was just like that (snapping fingers). I looked across the highway—my car was in this direction coming back towards Houston and the truck was over here and the fellow riding with me was thrown underneath the truck over there.

"Q. All right. Now, Harold, did you or not have any warning at all that this truck was going to pull out in front of you?
"A. Not the least in the world.
"Q. As I understand this picture from your testimony, you were traveling down the center lane and this automobile and this truck were coming in the opposite direction from you in which lane?
"A. On the extreme right—they were on their side of the three-way lane—both of them.
"Q. On the extreme right hand lane—is that right?
"A. Yes.
     *     *     *     *     *     *     *     *     *     *     *     *
"Q. How fast do you judge this truck was going?
"A. Well, I would say it was doing the same amount of speed I was, if not a little more.

"Q. All right. And how far was this car from here to you, how far behind that car was he?

"A. When I first saw him?

"Q. When you first saw him.

"A. It must have been a good 100 yards or maybe a little farther.

"Q. All right. When this other car started slowing down, or whatever it did, how close did he finally get up to the back of this other car?

"A. He was right behind it—he was just right on it but he was still on his side—he just ran up behind this car and the highway was still clear.

"Q. What was in your right hand lane—your extreme right hand lane?

"A. There was a car.

"Q. All right. Were you passing that car or getting ready to pass it, or what?

"A. I was passing it.

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

"Q. And about—you say your front bumper got about even with the door of the car that you were passing when the collision occurred? I am not sure if I recall that testimony right.

"A. Yes, somewhere about that; I was about half past the car that I was trying to get past.

\*  \*  \*  \*.  \*  \*  \*  \*  \*  \*  \*  \*

"Q. Long enough to do what?

"A. That I could see that there was not nothing in my way when I started and when I got out there, there was still nothing in my way and the truck wheeled out there like that (snapping fingers). There was not any reason in the world for it.

"Q. So you started to go on past the car in ahead of you and you were traveling along in the process and passing him within, roughly, 200 or 300 yards and the center lane ahead of you, you say, was clear and you say the truck suddenly came out from behind the car that was traveling in the opposite direction —is that your testimony?

"A. Yes, and I believe that car was slowing up, but I am not sure of it.

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

"Q. And you testified that that car was right about to your left when the impact occurred—is that right?

"A. I don't really know what that car was doing over there; when I got in this skid, I just know that that truck was coming towards me and my eyes were on that truck. This car to my left, I don't know whether she pulled off of the highway or what happened to her.

"Q. The truck had never gotten past the other car—is that your testimony?

"A. Yes, sir, as far as I know, he had never gotten past the other car; he just whipped out from behind her, just ran up behind her, he just whipped out just like that (snapping fingers).

"Q. And as far as you know, that car was still in the extreme right lane?

"A. Yes, sir; that car might have been pulling off but, anyhow, the back end of that car was still in that lane—she was just in the act of pulling off or should have been.

\* \* \* \* \* \* \* \* \* \* \* \*

"Q. That is your best recollection, isn't it?

"A. Well, I threw on my brakes and was sliding in that middle lane and that truck coming towards me, I didn't have no time to look at that car—I was watching that truck.

"Q. Let me ask you this—was the truck ahead of the No. 2 car or behind the No. 2 car at the time of the impact or were you abreast of the No. 2 car?

"A. All I remember is he whipped out from behind that car and I threw on my brakes and started sliding and the truck came on into me.

"Q. Your mind is pretty clear about the three but you are a little uncertain about the car that the truck was passing— is that it?

"A. I will say the last time I put my eyes on that car he was coming on my side and everything was fine with him, but then I put my eyes on the truck and I didn't know any more.

"Q. The last time you saw the No. 3 car that the truck was coming from behind, it was in the north lane, traveling in the same lane that the truck was traveling?

"A. Yes, sir.

\* \* \* \* \* \* \* \* \* \* \* \*

"Q. As far as you know, Mr. Crawford, was either of these other two vehicles involved in any way in this collision, or did either the truck or your car come into any contact with these other two vehicles that you say were on the right and on the left?

"A. To the best of my ability, they did not, they did not either one come in contact with either one of those cars—

"Q. That was a rather violent collision, wasn't it?

"A. Yes, sir.

\* \* \* \* \* \* \* \* \* \* \* \*

"Q. You just don't know. Well, approximately how far away would you say that the truck was from you when you saw it whipping out into the center lane, as you have described it?

"A. How far away from me when he whipped out in front of me?

"Q. Yes, sir.

"A. Just long enough for me to take my foot off of the accelerator and put on the brakes and slide, I don't know how many feet, just a few feet and then—like that—(snapping fingers).

    *    *    *    *    *    *    *    *    *    *    *    *

"Q. All right. I will repeat it. As you were traveling in the center lane—

"A. Yes, sir.

"Q. (Continuing)—you testified you suddenly and unexpectedly saw this truck, or you saw the truck suddenly and unexpectedly whip out from behind the vehicle that it had been traveling behind?

"A. Yes.

"Q. All right. My question is: At that time, when the truck came from behind the other vehicle, approximately how far were you apart—your car and the truck? Did you get my question?

"A. Yes. I would say 50 feet—now, I don't know actually, that is just roughly."

All of the testimony quoted above is plaintiff's own testimony. If plaintiff's testimony be taken as true, it was not possible for defendant's truck driver by the use of his brakes to have prevented the collision. Plaintiff's description of the accident as happening "like that (snapping fingers)" was accepted by the jury as correct and eliminated the doctrine of discovered peril.

If plaintiff's estimate of the distance between them (roughly 50 feet) and of the speeds be taken as true, there was not more than one full second elapsed time between the truck driver's turn into the center lane and the impact. Having accepted plaintiff's testimony as true, the jury could not have given any other answer to Special Issue No. 39 than they did. It may be said in passing that the writer does not understand how the jury could have found that the truck's turning directly into plaintiff's path was not negligence, but that is not raised here.

In this attempt to raise the issue of discovered peril and thus make the jury misconduct material, plaintiff is in the awkard position here of having to adopt a theory of the case which contradicts his own testimony. It is doubtful that discovered peril is raised under the defendant's truck driver's testimony.

In order to give plaintiff the benefit of the most favorable evidence, the truck's speed should be taken as 30 miles per hour (testified to by the truck driver) and the distance between them taken at 210 feet. Plaintiff testified he was going 55 miles per hour. A vehicle traveling at 85 miles per hour, the combined rate of speed of the two vehicles, covers 210 feet in less than two seconds. So, considering the truck driver's testimony as true, he had less than two seconds to do anything after he saw that the plaintiff's car was out of control, unless one or both vehicles drastically reduced their speed. I have carefully searched the entire record for evidence of the braking time and distance of defendants' truck and plaintiff's car or of a similar truck and car under similar circumstances which will raise discovered peril in this case, and find none. The only evidence on that subject is that of the truck driver. He testified that upon discovering plaintiff's car out of control he immediately applied his brakes; and that his truck traveled about seventy feet to the impact after discovering plaintiff's car out of control. He accounted for that seventy feet by saying that "reaction time" took about 15 or 20 feet and that his braking distance was 35 or 40 feet. Of course the jury did not have to believe him, but there is no other evidence to support a finding that he could have stopped soon enough to have prevented the collision. There is no evidence of plaintiff's braking distance. That brings plaintiff to this dilemma:

(a) If he takes the position that the braking distance of defendants' truck and his car is a matter of common knowledge which the jurors may supply from their "common sense", then the objectionable remarks of the juror Landis were also upon a subject of common knowledge and hence not reversible error. Gillette Motor Transport Co. v. Whitfield, 200 S. W. (2d) 624.

(b) If he takes the position that the braking distance of defendants' truck and his car is technical factual information and not a matter of common knowledge (as plaintiff has in his brief) then his proof is probably deficient and he has probably failed to raise the issue of discovered peril using the truck's brakes as the means at the truck driver's command by the use of which the accident could have been avoided. The Court of Civil Appeals did not pass on the sufficiency of the evidence. For this reason, the remarks of the juror are probably immaterial even had the jury accepted defendants' version.

See the case of Wells v. Texas Pac. Coal & Oil Co., Com. App. Opinion adopted by the Sup. Ct., 140 Texas 2, 164 S. W. 2d

660, for a similar head-on highway collision in which the court held as a matter of law that the doctrine of discovered peril was not raised. See also Turner v. Texas Co., 138 Texas 380, 159 S. W. 2d 112.

Neither may plaintiff take "bits" of evidence out of two basically inconsistent theories where those "bits" are inconsistent with each other and weave them together to make out discovered peril. Thus he cannot in this case take the truck driver's testimony that he saw plaintiff go out of control and start sliding across the highway when they were some 210 feet apart and weave that into the other version of the facts that plaintiff had his car under control when the truck driver suddenly "whipped" out from behind another car directly into plaintiff's path at a distance of about 50 feet. This court clearly held in the Wells case, supra, that a plaintiff cannot "assemble various bits of testimony from the record" and weave them together to support discovered peril when the "bits" are inconsistent with each other. I will quote at some length from the Wells case, supra, because of the similar fact situation.

"In application for writ of error two theories are advanced in support of the argument that the trial court's judgment should be upheld on the doctrine of discovered peril. In developing these theories the application assembles various bits of testimony from the record. We quote from the application as follows:

" 'Mr. Jackson, the truck driver, testified that immediately before the collision he was driving between 30 and 35 miles an hour; that, driving at that speed and under the circumstances existing on that road at that time and with safety to himself and his truck, he could have stopped that truck by the use of his brakes in from 20 to 30 feet; that at the time he saw the Wells car it was 150 feet or further from him; that he realized Wells' perilous condition and that he did not apply his brakes and thus use the means at his command to avoid the collision.

" 'The undisputed evidence already set out establishes that Wells crossed the center line of the road 36 feet from the point of impact and that he was going at a 45 degree angle across the road.

" 'It is a matter of simple arithmetic that Jackson could have stopped in time to avoid this collision had he applied his brakes.

" 'Since Wells traveled only 36 feet on the East side of the road and since Jackson was at least 150 feet from Wells when

Wells made the turn, it becomes evident that Jackson was at least 114 feet from the place of impact at the time he discovered Wells' peril. Therefore, giving him twice the estimated distance required to stop, if Jackson had stopped in 60 feet from the place where he saw Wells, Jackson would have been, at the very least, 54 feet from the place of impact and at a dead stop.

" 'So Wells would have passed at least 54 feet in front of Jackson and onto the shoulder of the road and possibly into the level field and the accident most certainly would not have happened.'

"As is apparent from a consideration of that theory, it is based upon the assumption that the truck traveled 114 feet while the automobile traveled 36 feet. By the uncontradicted testimony in the record the automobile was traveling at a very high rate of speed and the truck at a much less rate. The record clearly does not support that theory of discovered peril."

So I conclude that it is not possible to have discovered peril under plaintiff's version of the facts; that the proof is probably deficient to raise it under defendants' version of the facts; and that even if the proof does raise it under the defendants' version of the facts, the jury had rejected defendants' version of the facts at the time of juror Landis' remarks.

Our courts should serve as a forum for orderly resolving disputes between citizens. Of course the courts should strive to obey and enforce all of the rules of procedure and thus achieve as nearly as possible abstract justice, but unnecessarily prolonging litigation because of minor violations of the rules of procedure works an injustice on both parties. See 21 Texas Law Review 794. The misconduct involved here was not the fault of either party. Our judicial processes and the law are not mechanical but are alive and human. A juror should use his "common knowledge" in evaluating evidence—"common knowledge" derived from his own experience. Therein lies the strength of the jury system. However, the courts have encountered great difficulty in determining what is "common knowledge" and what is "personal knowledge" of a juror. 26 Texas Law Review 89. Our juries are not composed of individuals trained in the discipline of the law. Jury verdicts should not be so fragile that a losing party may, by an industrious and lengthy examination of the ex-juryman on his motion for new trial, inject serious questions of error into a high percentage of the cases tried. The practice now is for the winning party to make an equally lengthy examination of the ex-jurors in an effort to raise an issue of

fact as to what happened within the jury room. This often results in the jurors being "harassed and upset" by the contending parties. McDonald v. Pless, 238 U.S. 264, 35 Sup. Ct. 783, 59 L. Ed. 1300. Here the Statement of Facts containing the evidence is composed of 350 typewritten pages while the examination of eleven ex-jurors produced by both sides on the motion for new trial is reported in 152 typewritten pages. Thus we have developed a "trial upon a trial" and have added one more hazard to the progress of litigant towards justice. A litigant should not be deprived of his right to question every member of a jury in open court, 23 Texas Law Review 81, but the scope of the inquiry should be limited to matters truly going to the integrity of the verdict—fraud, tampering, prejudicial and inflammatory statements, statements of new evidence of the very transaction in issue, and similar matters. This court should narrow rather than broaden the limits of the scope of inquiry into jury conversation constituting misconduct. For a good discussion of the development of Rule 327, T.R.C.P., see Tumlinson v. San Antonio Brewing Ass'n, 170 S. W. 2d 620.

The juror Landis stated that his company had a method of testing a driver's reaction time. He did not give the results of any specific test, except that it varied from driver to driver. "Reaction time" is nothing more or less than the time it takes a driver to move his foot to the brake after seeing danger. There is testimony in the record about "reaction time". The fact that there is a method of measuring "reaction time" did not help or hurt either party here because both parties testified about their reaction. Juror Landis made the remark "You would be surprised how far it takes a bus to stop" and continued "that a bus has air-brakes and can stop quicker than a truck, which has hydraulic brakes". At that time, the jury was in the second day of deliberation. There is testimony in the record that the truck had hydraulic brakes. These remarks are of small consequence when weighed against the evidence and argument of a week-long trial. See 27 Texas Law Review 708. Extending the rule to include this type of remark endangers most jury verdicts if the losing party makes diligent inquiry into the conversation within the jury room. This type of remark by a juror should not upset a verdict unless it constitutes unsworn testimony of material facts and enters into the discussion at a time when the jury is focusing upon a critical issue and in such a manner that the remark itself probably changed the result of the jury's deliberation. Akers v. Epperson, 141 Texas 189, 171 S. W. 2d 483, 156 A.L.R. 1028.

Believing that at the time Special Issue No. 39 was answered by the jury the objectionable remarks of the juror were immaterial and in themselves not of sufficient gravity to require a reversal in that no injury probably resulted, I feel that the result reached by the trial court and the Court of Civil Appeals was correct on this point and that the judgment of the trial court should be affirmed. Rule 327, T.R.C.P.

Opinion delivered March 14, 1951.

Rehearing overruled April 11, 1951.