Tony Allen **LEMKE** et al., Appellants,

v.

**TEXAS & NEW ORLEANS RAILROAD COMPANY, Appellee.**

No. 13883.

Court of Civil Appeals of Texas.

Houston.

March 15, 1962.

Rehearing Denied April 5, 1962.

Frank Abraham, W. James Kronzer, Houston, Hill, Brown, Kronzer & Abraham, Houston, of counsel, Pollan & Nicholson, Rosenberg, of counsel, for appellants.

John F. Heard, Houston, Baker, Botts, Shepherd & Coates, Houston, of counsel, for appellee.

WERLEIN, Justice.

This suit was brought by Tony Allen Lemke and Richard Roy Lemke, minors, by and through their Guardian, Leroy Lemke, to recover for damages arising out of the instantaneous deaths of their parents, Allen Tony Lemke and Marjorie Juanita Lemke, when their stalled automobile was struck by appellee's passenger train at a crossing about a mile and one-half west of Sugarland, Texas. The evidence shows that Mrs. Lemke, accompanied by her husband, a prison guard, with the two minor appellants in the back seat of the car, after driving in a westerly direction along U. S. Highway 90-A, made a right turn and headed north on a road which crossed appellee's tracks and led to Central Prison Farm No. 1. The car stalled with the front wheels about on the south rail of the main tract of appellee which ran parallel with said Highway 90-A and about 50 feet therefrom. While in such position and before the occupants of the automobile were able to get out, appellee's train, the Sunset Limited, traveling in a westerly direction, struck the right side of the car near the front wheel, killing Mr. and Mrs. Lemke and one of their children seated in the front seat with them. The jury answered all special issues covering primary negligence and two contributory negligence issues in favor of appellee.

It was stipulated by the parties that appellants and their parents were in a position of peril prior to the collision. The jury found that the engine crew discovered the perilous position of the Lemke vehicle and after making such discovery realized that the driver thereof in all reasonable probability would not be able to extricate herself and the automobile from such position of peril. The jury found, however, on the crucial "time" issue that the engine crew did not actually discover and realize the perilous position of the Lemke vehicle and occupants thereof before the collision in such time and distance that by the exercise of ordinary care and the use of all the means at hand, having due regard for

their own safety and the safety of the train and the occupants thereof, they could have avoided the "fatalities" made the basis of the suit.

Appellants have appealed from the judgment entered in favor of appellee on the jury verdict and have assigned a number of points of error which are briefed together, the gravamen of which is that the court erred in refusing to admit into evidence, either generally or for purposes of impeachment, the speed tape on appellee's train, appellants' Exhibit No. 17, and the associated testimony of the witnesses, Coogler, Chambers, Lemke and Shilstone, which exhibit and testimony they say would have shown that the engine crew did not use all the means at their command to avoid the collision.

Appellee contends that the court properly excluded such tape and allied testimony because no proper foundation or predicate was laid to warrant the admission of the tape and the same was not admissible for any purpose. The respective contentions of the parties require a careful analysis of the testimony with respect to the speed tape to determine whether the court erred in excluding it.

The evidence shows that the original speed recorder tape which was taken from the engine involved in the collision was produced in court by appellee and that the first testimony with respect to what it showed was adduced in evidence by appellee in examining its witness, Mr. Coogler, the assistant supervisor of locomotive maintenance, who was riding in the engine cab at the time and on the occasion in question. After appellee's counsel qualified Mr. Coogler as being able to interpret speed tape, he questioned him and elicited answers as follows:

"Q. I just made some reference to a speed tape, and I will ask you is a locomotive equipped with some device that records on a tape the speed at which the locomotive was traveling at certain times?

"A. Yes, sir.

"Q. What is that called?

"A. Speedometer, they call it a speed recorder.

"Q. Is it locked up?

"A. Yes, sir, it is sealed, at each division point a new tape is applied.

"Q. Based upon your experience, is this one of those speed tapes?

"A. Yes, sir.

"Q. As the train goes along, the engine goes along, I notice what appears to be a pencil mark tracing, which goes up and down, what is that?

"A. That is the speed of the locomotive. As the speed comes up, the pencil line goes up, right here we have 76 miles an hour, and here he is stopped or the train is going 10 miles an hour. Each mark is 1 mile.

"Q. For your information, we have furnished opposing counsel with this, and this is a copy of it, it was made prior to the trial, and I think it has been agreed that this is where the emergency application was made. Would you tell us that that reads there?

"A. This looks like right here a quick stop or emergency application of the brakes.

"Q. What lines were those between?

"A. It looks like that would be 57 or 58 miles an hour.

"Q. It is between 50 and 60 miles an hour?

"A. Yes, sir, I would say 57 or 58 miles an hour."

On cross-examination appellants had Mr. Coogler put an arrow and "E M" at the agreed point where the emergency brakes were applied and the number "58" indicating the speed of the train immediately prior to the application of the brakes. The speed tape was used by appellee to establish the speed of the train at the agreed point where the emergency application was made. Coogler also testified as to the speed of the train in Sugarland, some mile and one-half east of the crossing, and put the letter "S" on the speed tape marking the dip shown on the tape at such place. Coogler's testimony that appellee had a master chart which would pinpoint places was refuted by appellee's claim agent, Mr. Hansen, who investigated the accident. Mr. Hansen testified to questions by appellee's counsel, that such chart was no longer used by appellee, but that "From the tape they count off where the emergency stop was made and they can then back off and count the number of miles and then determine where they left. If the tape was placed on in Houston, and if the accident happened thirty miles from Houston, that would be the point." On cross-examination he testified that if furnished a ruler where he could split the miles down to one-tenth, he could tell how far it was from where the speed picked up after Sugarland to the point of the accident, provided he was informed whether the vertical lines on the tape represented one or two miles. Coogler had previously testified that each mark was one mile.

Mr. Chambers, the locomotive engineer of the train in question, testified that the accident happened at milepost 26.3, that is, 26.3 miles from the station in Houston; that speed tapes were put in the trains to check the speed; that there is a little needle which marks on the speed tape the different speeds, and that the low place on the tape represented going through Sugarland where the speed was reduced. He also testified that when he got out of Sugarland he turned the speed on and raised his speed continuously until the point where he put on the emergency brakes, and that as he came through Sugarland and passed the last red light at Sugarland, "that is the place where you start giving it the gun."

Appellants, in connection with their bill, showed that the distance between the cross-

ing where the accident occurred and the last red light at the point where the engineer starts "giving it the gun" was measured by Mr. Lemke with a 100 foot steel tape, and that such distance was 8,114 feet. Mr. Herbert M. Shilstone, civil engineer and senior partner of Shilstone Testing Laboratories of Houston, long engaged in mathematical and technical studies and scientific investigations, testified in connection with appellants' bill of exceptions that he could and did scientifically and mathematically calculate the distance from the point where the engineer said he started gaining speed after he went through the last red light at Sugarland to the point of deceleration marked "E M" on appellants' Exhibit 17, and that such distance was 9,027 feet, with the accuracy of the last digit in question. He also testified that he had prepared an accurate enlargement of the tape, appellants' Exhibit No. 30, to increase the accuracy of his measurements. This exhibit was excluded by the court and is a part of appellants' bill. Such evidence, if admitted, coupled with the testimony of Mr. Lemke, would indicate that the engine crew did not apply the emergency brakes until after the engine had passed the crossing in question. It is true that Mr. Shilstone did not know anything about the working of the speed recorder, but he testified with respect to the speed tape and the lines thereon that the chart was a relatively simple type.

The trial court indicated several times that if it could be shown what the vertical lines on the tape meant and the distance between them, distances could be shown. Such proof was made. The court then expressed the opinion that it was not shown that the lines on the tape were correlated to distances on the ground, and apparently for such reason the court excluded the tape. As we view the matter, the only correlation established by the evidence between the distances as shown on the tape and on the ground is dependent upon whether appellee's engineer established with sufficient accuracy the approximate site of the last

red light passed on leaving Sugarland as the point where the acceleration of the train commenced. That part of the bill of exceptions, dealing with approximate distances between the towns through which the train runs on the trip from Houston to San Antonio, merely established what had already been proved, to wit, that the distance between the vertical lines on the tape was one mile, but such evidence fell short of correlating distances on the tape and on the ground, although it did indicate that such correlation probably could be established by a witness who could interpret speed tape and who knew definitely the distances between the towns en route.

We are of the opinion that the point of acceleration on leaving Sugarland was sufficiently shown to be the last red light passed on leaving such town. There might be some variation, depending upon whether the engineer began to accelerate immediately upon passing the red light. There is no evidence, however, that he did not give it the gun and begin to accelerate at such point on the day of the accident as he customarily did.

The testimony of both the engineer and fireman on the train was that they first observed the Lemke car when 350 feet from the crossing and that they applied the emergency brakes approximately 150 feet from the crossing. The engineer testified that the train would travel 50 to 75 feet before the brakes would take hold. Basing the calculation upon the testimony of Mr. Lemke and Mr. Shilstone, the difference between the measurement upon the ground from the last red light to the crossing and the measurement on the tape from the point of acceleration on passing such light to the point of deceleration, is 9,027 feet less 8,114, or 913 feet. By adding to 913 feet the number of feet from the point of deceleration on the tape to the crossing based on the engineer's estimate of 75 to 100 feet, it would appear that the difference between the distance on the ground and the distance shown on the tape from the red light to the crossing is approximate-

ly 1,000 feet. Even if allowance is made for a considerable variation, the testimony adduced by said witnesses would still indicate that the emergency brakes were not applied until after the engine had passed the crossing in question.

Such evidence would tend to impeach the testimony of the engineer, who said he observed the automobile when he was 350 feet away from the crossing, and that after he realized the automobile was going to stop and not get over the tracks, he did everything in his power to avert the accident. It would also tend to impeach the fireman's testimony and that of Mr. Coogler who testified that he felt the application of the brakes in emergency a few seconds before he felt the impact when the engine struck the car. Such evidence would also tend to corroborate the testimony of Esty, the ex-convict, who testified that he was on the prison farm some 50 feet away from the crossing and that the train did not apply its brakes and slow down until after it had hit the car. This witness, who was appellants' only eye-witness to the accident other than Tony Lemke, a child five years old when the collision occurred, also testified that when the Lemke car stalled, the train was a quarter of a mile from the crossing.

■ We are of the opinion that the speed tape, if admissible, was of such materiality that its exclusion was reasonably calculated to cause and probably did cause the rendition of an improper verdict and judgment in the case. Rule 434, Texas Rules of Civil Procedure; Salinas v. Casualty Insurance Company of California, Tex.Civ.App.1959, 323 S.W.2d 600, aff'd 333 S.W.2d 109. This view is strengthened by consideration of a note sent by the jury foreman to the court stating: "We *a* hung up on Issue No. 11. What should we do?" Special Issue No. 11 inquired whether the engineer failed to make a timely application of the brakes of the train. The jury also sent a note to the judge stating they would like to know how far Mr. Coogler estimated it would take to stop the train.

Coogler had testified that his best estimate was that the train could be stopped in 1100 to 1200 feet. The engineer, Chambers, testified he believed the front of the train moved around 1450 feet past the crossing. If, in addition to such testimony, the jury had had the benefit of the speed tape and allied testimony, they very likely would have found that the engine crew failed, after actual discovery and realization of the perilous position of the Lemke vehicle, to exercise ordinary care to avoid the "fatalities". Had the speed of the train been substantially lessened, the engine might have struck the right front of the car with much less violence and brushed it aside without killing appellants' parents who were in the front seat. The potential lessening of injury or loss is a material consideration in discovered peril cases. In Missouri-Pacific Ry. Co. v. Weisen (1886), 65 Tex. 443, our Supreme Court stated:

"The injury would not have happened if the appellee had not been on appellant's track at a time when he ought not have been there. Still, after it was discovered that he would not effect his escape from the track in time to avoid injury, it was the duty of appellant to prevent the result. It could have done this, or, at least, it could have given the appellee more time to get off the track than was given him; and if he then failed to get entirely out of danger, *the violence of the concussion, upon which depended the extent and degree of his suffering, could have been softened.*" (emphasis supplied)

■ In the instant case the court inquired in the discovered peril issues as to whether or not the "fatalities" (not merely personal injuries) could have been avoided. The "time" inquiry is the sine qua non of the doctrine of discovered peril in that the additional time allowed might permit a person in a perilous situation to extricate himself therefrom, or it might lessen the impact and degree of injury. Missouri-Pacific Ry. Co. v. Weisen, supra; Crawford v. Deter-

ing Co., 1951, 150 Tex. 140, 237 S.W.2d 615; Ford v. Panhandle & Santa Fe Ry. Co., 1952, 151 Tex. 538, 252 S.W.2d 561; Missouri-Kansas-Texas R. R. Co. v. Montgomery, Tex.Civ.App., 323 S.W.2d 360, writ ref., n. r. e.; Texas & New Orleans Railroad Company v. Landrum, Tex.Civ. App., 264 S.W.2d 530, writ ref., n. r. e.

■ There can be no question as to the authenticity of the speed tape offered in evidence. It was produced and used by appellee in interrogating its witnesses, and it was shown to be the original speed tape upon which was recorded the speed of the train involved in the collision. We also think the accuracy of the speed tape was sufficiently established by appellee's witnesses. Appellee used the speed tape to prove the speed of the train just prior to the time of the collision and showed the agreed point of deceleration on the tape. Appellee now asserts that it interrogated Coogler only with reference to speed of the train at the time the emergency brakes were applied, and not with respect to distances. The record shows, however, that in discussing the chart, Coogler testified that each vertical line represented a distance of one mile, and he indicated on the tape not only the speed but the place where the deceleration occurred as the approximate point of the accident. He also indicated on the speed tape the place where the train slowed down for Sugarland and the place where it began accelerating after the engine passed the last red light coming out of such town. Appellee itself established by its claim agent that speed tape was used in locating places and the speeds at such places.

It seems obvious that the tape which shows speed must also show ascertainable locations and points where the train was running at such speed, or else the tape would be of no value whatever. We are unable to see how the recorder could be accurate as to speed and not as to locations. Speed and distance are necessarily correlated on the tape. Moreover, appellee did not introduce any evidence attacking the accuracy of the speed recorder and tape. By proving the speed and point of acceleration and the approximate point of the accident by use of the tape, and that the tape was used to locate points as well as to determine speed, appellee in effect admitted and vouched for its authenticity and accuracy. The evidence also shows that speed recorders were placed on all of appellee's engines and are apparently standard equipment.

Speed recorder tapes have been received in evidence to establish speeds of trains at material points prior to collision. In Johnson v. New York Central Railroad Co., 1959, 357 Mich. 40, 97 N.W.2d 769, 773, the court stated: "The Mercury diesel engine contained a speed recorder tape, which records automatically as the locomotive moves along the tracks the speed of the locomotive, the miles per hour, any stops, and the point of application of the brakes."

Apparently no objection was made in the Johnson case to the speed tape which was used to establish speeds of the train at various distances from the crossing and as certain definite locations. Objection was made to the Railroad's use of its speed tape in Whitton v. Central of Georgia Ry. Co., 1953, 89 Ga.App. 304, 79 S.E.2d 331, on the ground that it would take a qualified expert to show how the machine that marked the tape operated, and also because the witness who testified didn't know how the machine did operate. The court held that the tape was properly admitted in evidence over such objection because another witness had previously testified that the speed of the engine could be determined at any particular point from the record made.

■ Appellee further contends that in view of the indefiniteness in the accurate identification of the last red light in question as the point of acceleration of the train as shown on the tape, and the difficulty of making accurate measurements because of the small scale of ½ inch on the tape to the mile, the court properly excluded the tape and allied testimony. We do not

agree. Appellee, by producing and using the speed tape, as done, vouched for its accuracy and laid the foundation and predicate for its admission in evidence. Since there is no evidence in the record attacking the accuracy of the tape and speed recorder, it was error to exclude the tape, or in any event the pertinent part thereof showing the speed and distance from Sugarland to the point of deceleration, which part appellants last offered in evidence. Appellee's other objections go to the weight of the evidence and the credibility of the witnesses and not to the accuracy and admissibility of the speed recorder and tape.

Judgment reversed and cause remanded.