**TEXAS & N. O. RAILROAD CO., Petitioner,**

v.

**Tony Allen LEMKE et al., Respondents.**

**No. A–9022.**

Supreme Court of Texas.

Houston.

Feb. 6, 1963.

Rehearing Denied March 13, 1963.

Baker, Botts, Shepherd & Coates, Houston (John F. Heard, Houston, with firm), for petitioner.

Pollan & Nicholson, Rosenberg, Hill, Brown, Kronzer & Abraham, Houston, for respondents.

GRIFFIN, Justice.

This is a suit by the legally authorized guardian of Tony Allen Lemke and Richard Roy Lemke against the Texas & New Orleans Railroad Company, as defendant, to recover damages in excess of $100,000.00 resulting from the death of plaintiffs' parents when the automobile in which the parents were riding was struck by a thirteen-car passenger train pulled by a three diesel unit locomotive and traveling in a westerly direction at a road crossing about one and one-half miles west of Sugarland, Texas.

In a trial before a jury, all special issues covering primary negligence and two contributory negligence issues were answered in favor of the defendant railroad.

On the discovered peril issue, it was stipulated by the parties that plaintiffs and their parents were in a position of peril prior to the collision. The jury found that the engine crew discovered the perilous position of the Lemke automobile and after making the discovery, realized that the driver of the car in all reasonable probability would not be able to extricate herself and her car from such perilous position. On the crucial "time" issue the jury found that the engine crew did not actually discover and realize the perilous position of the Lemke car and its occupants before the collision within the time and distance that by the exercise of ordinary care and the use

of all means at hand the collision between the train and the car could have been avoided.

The trial court rendered judgment for defendant on the jury verdict. The plaintiffs appealed to the Court of Civil Appeals. The errors alleged complained of the refusal of the trial court to admit in evidence, either generally or for the purpose of impeachment, the speed tape on appellee's train, and the testimony of named witnesses. Plaintiffs claimed that such tape and testimony would have impeached the testimony of the defendant train employees that they did use all the means at their command during the time and distance interval between their discovery and the collision to avoid the collision.

The Court of Civil Appeals held the tape admissible and reversed and remanded the cause. Lemke v. Texas & N. O. R. Co., Tex.Civ.App., 355 S.W.2d 748.

The defendant, as petitioner, here assigns as error the holding of the Court of Civil Appeals that the speed tape and allied testimony were admissible in evidence and that a proper foundation had been laid as to the accuracy of the tape. We sustain this point and reverse the judgment of the Court of Civil Appeals and affirm the judgment of the trial court.

■ The trial Judge, in refusing to admit the tape, said that the points shown on the tape had not been correlated with any points on the ground, and that the point on the tape where the engineer had increased his speed was not shown to be any definite point on the ground, and that to admit the tape for the purpose of showing distance would be "nothing but misleading and prejudicial in this case."

No witness testified as to any point on the tape representing any particular point on the ground. No witness knew how long a time interval elapsed between acceleration or deceleration of speed and the change of speed would be reflected by the. stylus.

There were certain vertical lines one-half inch apart on the tape, which represented one mile or 5280 feet. This stylus and tape were operated by a device on a locomotive wheel, and the record or tracing on the tape was made by the revolutions of this wheel. In other words, a number of complete turns of this wheel were shown on the tape as one mile, but nothing on the tape showed where, on the ground, the mile started or ended. It was admitted by all parties that these vertical lines did not necessarily coincide with the marked mileposts on the ground.

The small scale of the tape was such that 1/16th of an inch equalled 660 feet in distance and 1/10th of an inch equalled 1056 feet in distance. The stylus mark or tracing shows to cover about 100 yards of distance. Plaintiffs made an enlarged copy, (about 7 to 1) which more clearly shows this fact.

There was no testimony as to the point on the ground in or near Houston, Texas, with which any of these vertical lines coincided. The same was true of the stopping place in San Antonio Texas, where it was testified the tape tracings ended.

There is testimony in the record that mileposts 24, 25 and 26 were in the vicinity of Sugarland, but there is no testimony as to the location of these mileposts either on the tape or on the ground, except the designation of certain mileposts by name and number. The engineer of the train involved in the collision was asked: "When you go through Sugarland, as you come on the outskirts of Sugarland, you pass milepost 25?" He answered, "Yes." All parties tried this case on the assumption that the accident happened .3 of a mile west of milepost 26, but no one ever put that spot on the tape. It was testified that these mileposts represented distances from Houston, but there was no point on the tape identified as the Houston starting point. There is a statement by one of the attorneys that the tape was installed on the engine in New Orleans, but no testimony to this effect. An examination of the tracing shows that it was being made prior to Sugarland for many more

than 26 vertical lines, or 26 miles, which would be prior to reaching Houston. There is really no identification of Houston on the tape, but assuming the collision occurred 26.3 miles from Houston, there are three vertical lines in the vicinity of Sugarland and of this collision that would be 26.3 miles from three definite points where the tracing shows the train was going slowly and which we presume was in Houston. Further, the testimony shows the stylus does not operate at less than ten miles per hour, and the tape does not show distance traveled at less than ten miles per hour.

The same reasoning applies to the end of the tracing, which witnesses testified was in San Antonio. There was testimony that it was 211 miles from Houston to San Antonio (beginning and ending points not being located on the ground). If the collision occurred 26.3 miles from some point in Houston, it should be only 184.7 miles to the stopping point in San Antonio. Assuming it is 185 miles, which would be 185 vertical lines, we have counted the vertical lines from three different vertical lines in the Sugarland vicinity. The vertical line fartherest east as the train was entering Sugarland is 187 vertical lines, hence 187 miles from the end of the tape tracing. The vertical line which is 185 vertical lines or miles from the end of the tape tracing is at a point after the tape shows the train had sharply decelerated its speed.

The above analysis demonstrates the lack of any proof to correlate the tape markings with ground positions, or of its accuracy to show ground position.

Plaintiffs' witness Shilstone, who was offered as an expert in reading the tape, testified that unless he took someone's word for determining the distances on the tape it would be necessary that "there has to be a starting point that has to be agreed upon as being a fact." He further testified that he had not gone back on the tape to determine where Houston was. In response to a question by the court, the witness testified that he did not make any calculation as to how far it was from the point the train started to increase its speed to the 26.3 milepost—the point of the collision. The witness further said that he had calculated only the distance shown on the tape between the beginning of the train's accelerated speed and the point of deceleration. This had no relation to points on the ground, so far as this witness was concerned. He measured this distance as shown only by the tape tracings.

Plaintiffs say that they fixed the starting point of the accelerated speed on the ground at the last red light as the train was leaving Sugarland. This claim is made by virtue of the following question propounded to the engineer:

"And just before that (milepost 25) as you come through Sugarland and you pass that last red light at Sugarland and you kind of curve around, the fireman can look back and see the train, and that is the place where you start giving it (the engine) the gun?

"Yes, sir.

"And you go past the 26 milepost?

"Yes, sir.

"And this accident happened at 26.3?

"Yes, sir."

By actual measurement, the last red light is 8114 feet prior to reaching the crossing. None of these objects referred to are shown on the tape or its enlargement. The tape shows that from the start of the accelerated speed to the start of the decelerated speed is 9027 feet. In other words, it is claimed that the deceleration of speed started 913 feet past the crossing where the accident took place. The width of the stylus trace at the point of deceleration is approximately 283.85 feet, and the width of the stylus trace at the point of acceleration is approximately 170.3 feet. The total is thus 454.16 feet, margin of tolerance. There is no testimony as to the accuracy of this tape as a measurement of distances shown in this

record. The engineer's testimony is indefinite as to where he accelerated his speed. It is not definitely fixed as the red light, the curve or where.

Plaintiffs claim that the accuracy of the tape was shown when defendant had its witness Coogler refer to the tape to show the train speed. The tape was not offered in evidence by defendant and was shown to the witness Coogler for the purpose of testifying solely as to speed. Defendant made no attempt to show accuracy or approximate accuracy as to the distance measurements on the tape as correlated to points on the ground. The accuracy of the tape to show speed was not questioned. Neither was there any question as to the speed of the train at the time it started decelerating or accelerating its speed. The only questions were as to the point on the ground where these actions took place.

The trial Judge was careful in bringing out all the evidence showing accuracy of the tape as a measurement of distance and the correlation of the tape with locations on the ground. He ruled the tape inadmissible. The trial court committed no error in the refusal to admit the tape in evidence, either to show distance or impeachment purposes.

Plaintiffs, who were seeking to have the tape admitted in evidence for the purpose of showing distance on the ground, had the burden of making the preliminary proof as to its accuracy and that it correctly portrayed the ground locations of the points of acceleration and deceleration. They failed to offer proof sufficient to satisfy the trial Judge. Under the facts as analyzed above, we cannot say that the trial Judge abused his discretion in not permitting the introduction of the tape in evidence.

The judgment of the Court of Civil Appeals is reversed and the judgment of the trial court is affirmed.

SMITH, J., dissenting.