Leeland MURPHY et al., Appellants,

v.

Chester W. DAVIS et al., Appellees.

No. 6098.

Court of Civil Appeals of Texas.

Beaumont.

July 3, 1957.

Rehearing Denied Sept. 11, 1957.

Dies, Anderson & Dies, Lufkin, for appellants.

Collins, Garrison, Renfrow & Zeleskey, Lufkin, for appellees.

HIGHTOWER, Justice.

The suit was instituted to remove certain restrictive covenants on lots of the plaintiffs in Block No. 1 of the West Eastwood Addition to the City of Lufkin. The verdict of the jury was adverse to the plaintiffs who have here assigned error to the trial court's failure to grant a new trial because of jury misconduct. The points are substantially stated:

(1) That certain jurors failed to fully divulge their knowledge about the property on the voir dire examination; (2) that one of the juror's statement to the other jurors that he had prior legal training was prejudicial; (3) that jurors Langford and Bishop viewed the property during the trial and conveyed their findings to the rest of the jury during deliberations. (4) That the court erred in failing to consider juror Bishop's testimony relative to his conduct. (5) The court's error in holding the jurors to be plaintiffs' witnesses. (6) Because of the combined effect of the errors and misconduct.

After reviewing the lengthy record of the whole case, we are of the opinion that the appellants' points 1, and 2 are without merit in the circumstances, and that their points 3, 4, 5 and 6 should be sustained. However, by reason of the appellees' 6th counterpoint following, the judgment of the trial court must be affirmed, for if the appellees were entitled to an instructed verdict, as was requested at the close of the evidence, such fact under the provisions of Texas Rules of Civil Procedure rule 327, renders immaterial the alleged misconduct urged for reversal. Western Textile Products Co. of Texas v. Sidrian, 153 Tex. 21, 262 S.W.2d 942; Smith v. Travelers Insurance Co., Tex. Civ.App., 205 S.W.2d 432, n. r. e.:

*"Counter Point No. Six*

"The Court properly refused to grant appellants' motion for New Trial because there was no issue of fact for the jury and appellees were entitled to an instructed verdict in their favor:

"(A) Because the undisputed evidence showed no change occurred within the West Eastwood Addition;

"(B) Because the undisputed evidence showed that appellants brought the suit for financial advantage, and that serious injury would result to appellees;

"(C) Because the undisputed evidence showed that appellants were estopped to ask cancellation of the restrictive covenant."

The property involved, Block No. 1 of the West Eastwood Addition to the City of Lufkin, was originally laid out as a rectangular block approximately 350 feet in length, north and south by 292 feet in width, east and west. This block was bisected dead center lengthwise and each half consisted of five lots approximately 70 by 146 feet restricted by covenants running with the land to residential use only. To the north, west and south this block was bordered by three through streets, fifty feet in width, Andrews Avenue, Lock Street and Nesbit Avenue, respectively. The east side lots of the block fronted on a sixty foot street known at that time as Moore. This street was later to become the primary bone of contention in the appellants' efforts to remove the restrictions. The present recitation of physical facts and circumstances is necessary in order to fully evaluate the hereinafter mentioned jury misconduct. The plaintiffs were home owners on lots 1, 2, 3, 4, and 5 fronting on Moore Street and the defendants' homes were directly behind on lots 6, 7, 8, 9, and 10 fronting on Lock Street. For several years prior to the suit this block, together with those surrounding it, appears to have been a typically nice, quiet, comfortable neighborhood, many of the neighboring blocks also being restricted to residential use.

About the year 1950 Moore Street was widened from sixty feet to a one hundred and twenty foot, six-lane highway. Two of these lanes are parking lanes. The widening of this street was accomplished by taking a sixty foot strip off the appellants' frontage, leaving their lots only eighty-six feet deep. The name was then changed from Moore Street to Timberlane Drive, as it will be hereinafter referred to. Timberlane Drive was also known and designated as U. S. Highway 59.

The following is a substantial and necessary summary of the evidence adduced on the trial of the merits:

That since the completion of Timberlane Drive the flow of traffic thereon had greatly increased; that it served as, and was, a bypass for highway traffic formerly routed through the business district of the City of Lufkin; that due to such heavy traffic it had become exceedingly dangerous for some of the plaintiffs' children to play in their front yards, the plaintiffs' homes fronting only fifteen feet off the west curb line of the Drive; that the resulting noise of the traffic had become annoying to the extent that their homes were no longer enjoyable; that shortly subsequent to the opening of Timberlane Drive the City, by ordinance duly enacted, had designated all property adjoin-

ing each side of the Drive for a depth of one hundred and fifty feet as "Zone F" commercial property, excepting only those blocks burdened with similar restrictions, that the Zone F designation generally, but with some reasonable exceptions, permitted the erection and pursuit of most types of business enterprises; that as a result thereof a considerable number of commercial enterprises had been established in their general neighborhood, particularly in the blocks immediately adjacent to the north and south of Block No. 1, such as filling stations, a root beer stand, cookie bakery, an electrical appliance company, a construction firm office, a children's playground park with the usual types of rides and entertainment, a hurricane fence company, a grocery store, beauty shop, barbecue stand, sewing center and dental office; that some of the establishments either stayed open all night or to 10 or 12 o'clock; that the noise, and other discomforts naturally resulting from the conducting of some of these businesses, combined with the hardships wrought by the uses of Timberlane Drive, had defeated the purposes for which Block No. 1 of the West Eastwood Addition was originally restricted, and that it was no longer feasible or practical to continue them.

Quite naturally the lawsuit resulted from the defendants' decidedly opposite view of the effect of the above-enumerated physical changes in the neighborhood, and it was their contentions, supported by testimony, and other evidence, that the proof offered by the plaintiffs would not justify a removal of the restrictions and, further, that their removal would result in serious damage to the use and value of their property. Among other specific matters, they strongly joined issue with the plaintiffs as to whether the removal of restrictions on the plaintiffs' lots would cause businesses to so jam and crowd up to the rear of defendants' lots as to render them unfit for residential purposes.

With this background of physical facts and evidence the following issues were submitted to, and answered thusly by, the jury:

"Special Issue No. 1

"Do you find from a preponderance of the evidence that there has been such a change in the character of the neighborhood of the West Eastwood Addition that it is no longer possible to accomplish the purpose for which the restrictive covenant, restricting the addition to residential property only, was originally intended?

"Answer: 'We do' or 'We do not'.

"Answer: We do not.

"If you have answered Special Issue No. 1 'We do', and only in that event, then answer the following special issue:

"Special Issue No. 2

"Do you find from a preponderance of the evidence that any of the defendants will suffer material damages if the residential restrictions are removed from the West Eastwood Addition?

"Answer: 'They will suffer material damages' or 'They will not suffer material damage.'

"Answer: No answer."

In the light of all the foregoing, the following summary of the testimony given by some of the jurors upon the hearing of the plaintiffs' motion for new trial because of jury misconduct is to be examined in order to ascertain whether certain acts of misconduct were material and, if so, whether injury probably resulted to the appellants by reason thereof; Rule 327, supra, relating to motions for new trials for jury misconduct:

Regarding the conduct of juror Bishop, jurors Parrish, Baird and Langford testified respectively:

Juror Parrish: Mr. Bishop said he visited the scene and that he believed it was still possible to live there under those conditions like it is now. I wanted to lift the restrictions the first time and changed my vote right around the last.

Juror Baird: I heard Mr. Bishop say that he had seen the property. He said he was roused up over it and he had taken it upon himself to get in his car and go look it over. I considered Mr. Bishop's statements along with the other evidence in the case.

Juror Langford: I heard Mr. Bishop tell that he had driven around the property and after that his statement that in his opinion the restrictions should not be removed and after that he told the jurors that the property was still suitable for a residential area, and that he did not feel like lifting the restrictions himself.

Sustaining the objection of counsel for the appellees to the effect that juror Bishop's testimony regarding his own conduct should not be considered by the trial court for the reason that counsel for the appellants had not obtained, or had failed to attach to their motion for new trial, an affidavit from juror Bishop and failed to give an explanation for such failure in connection with his conduct, the trial court refused to consider the following testimony, which testimony has been preserved by Bill of Exception.

Juror Bishop: (Questioned by Counsel for appellants)

"Q. I asked you whether or not that you had visited the property between the time you were selected as a juror and the time you went into your deliberations, didn't I, Mr. Bishop? A. Yes, sir.

"Q. And you told me then that it was true that you had gone around—driven completely around the property one afternoon when you got off the jury? A. Yes.

"Q. And that you looked at it and sized it up and tried to clarify in your mind and determine for yourself out there what the true facts were, didn't you? A. Well, I didn't go out there to determine—to draw my opinion of the case, now. I was curious why all this stuff was getting pulled into there, that caused me to go out there.

"Q. All right, sir, and you wanted to get a clear picture from your own view how the property lay and what the condition of it was, didn't you? A. Well, I was pretty well acquainted with the property, and I wanted to see if it had changed as much as it had been said it was in the courtroom.

"Q. And that was your purpose in going out there? A. Yes.

"Q. And you determined in your own mind what the situation was, and determined in your own mind that there had been no change, isn't that right? A. Well, I knew there hadn't been that much changes before I drove out there. Going out there didn't have anything to do with my opinion on the case. It didn't make me make up my mind.

"Q. Did it just back up the opinion you had whenever you were selected as a juror here? A. Well, I'll tell you what it did. I knew what way I was going to vote before I drove out by it. We had already got enough evidence for that.

"Q. And after that, of course, nothing was said or done that altered in any way your opinion about anything? A. No, sir.

"Q. And you just wanted to make sure the preconceived opinion you had out there was backed up by what you could determine on the ground? A. Well, I was fairly curious about the situation.

"Q. Of course, the court didn't instruct you not to see the property, did he? A. I don't think so.

"Q. And I assume that, when you drove completely around the property, that you looked at every house and every lot and block there was in question? A. Yes, I'm sure I did.

"Q. And you also made note, a mental note, at least, of the Bell's filling station and the other improvements about which there was some testimony here? A. Well, I had been noticing that for several months..

"Q. All right, sir, and so that, after approaching you and asking you to sign an affidavit, there was no way that I could obtain one, because you chose not to sign one, isn't that right? A. That's right."

Counsel for appellees: "For clarity, while we are still on the bill, may I ask one question in that regard? You didn't tell anybody in the jury room that you had visited the scene or tell them any purported facts you might have seen while you were out there? A. I did. I mentioned the fact that I had drove around the block.

"Q. You didn't tell anybody any facts that you claim to have gotten out there rather than gotten here in the courtroom? A. Well, no. The facts speak for themselves."

Counsel for appellants: "Q. All right, sir. Now, the facts that you say speak for themselves were determined both from the evidence that you heard here on the witness stand and your personal opinion of the property prior to the time you were selected as a juror, together with what you had seen when you went on the ground, wasn't it, Mr. Bishop? A. Let's have that again.

"Q. The facts were determined from what you had heard testified about from the witness stand, plus what you already knew about the situation out there before you were selected as a juror, and what you had seen out there when you went out there and went around the property; all of those went into your opinion? A. Well, I would say mostly what I heard here sitting in the jury seat, what I mostly drew my opinion on."

Counsel for appellees:

"Q. Did you see anything when you went out that time to look at the property during the trial, that you hadn't seen other times as you drove back and forth by that property, in other words? A. Well, I didn't notice anything too much out of the ordinary.

"Q. And you had been by it many times, hadn't you? A. I've been by several times in 34 years, yes.

"Q. You saw nothing different on that occasion than you had seen previously? A. No."

Counsel for appellants:

"Q. Now, Mr. Bishop, the statement you made to the jury that you had seen the property followed the first vote that was taken, didn't it? It came later? A. I believe so."

◼ Although the appellees strenuously contend on appeal as they did in the trial court that there is no allegations in the appellants' motion for new trial stating a sufficient reason for not obtaining an affidavit from juror Bishop, we note on page 45 of the transcript a somewhat lengthy statement in such connection to the effect that appellants were unable to obtain such an affidavit for the reason that juror Bishop refused to execute one. Even so, however, the trial court should have considered Bishop's testimony under the circumstances, no affidavit, or no explanation of failure to obtain an affidavit, to the contrary notwithstanding, and the trial court was clearly in error in excluding Bishop's testimony. The correct rule in this connection appearing in the opinion by the Commission of Appeals in Roy Jones Lumber Company v. Murphy, 139 Tex. 478, 163 S.W.2d 644, 646, and cases there cited, is as follows:

"Therefore, we hold that the correct rule is (1) if affidavits are attached to the motion showing material jury misconduct it is reversible error for the trial court to refuse to hear testimony on the motion, Stockwell v. Snyder, 126 Tex. 6, 84 S.W.2d 705; (2) or, if the motion discloses a reasonable explanation and excuse as to why affidavits cannot be secured and exhibited, in connection with sufficient allegations of material jury misconduct, it is likewise reversible error to decline to hear testimony on the motion, Robertson v. Humble Oil & Refin-

**224**

ing Co., supra; but (3) in the absence of such affidavits or a reasonable excuse for not exhibiting the same, a refusal to hear testimony from the jurors on the motion is a matter within the sound discretion of the trial judge."

■■ It is elementary that the question of jury misconduct is one of fact for the trial court's determination and that, where the evidence conflicts regarding the issue, the trial court's decision will be taken as final on appeal, unless there appears a clear abuse of discretion. Barrington v. Duncan, 140 Tex. 510, 169 S.W.2d 462. Of course, there appears no material conflict in connection with Bishop's testimony that necessitates consideration of this principle of law. The trial court just refused to consider the testimony. It is equally well settled that once jury misconduct is found to have occurred, the issue of whether it reasonably appears to have caused material harm to the party asserting is a question of law that the appellate courts may determine, and in the case at bar it does not appear to be seriously contended that juror Bishop's viewing of the property in dispute and communicating his finding thereafter to the rest of the jury was not misconduct.

As to whether Bishop's conduct probably resulted in material harm to the appellants, we note from his testimony above that before his view of the property, although he stated that he had been passing by it for 34 years, he was in an extreme state of indecision and doubt as to just which of the party litigants' were representing the true facts about the property in dispute. This conclusion is strongly corroborated by his statements that "I was curious why all this stuff was getting pulled into there, that caused me to go out there. I wanted to see if it had changed as much as they said it had in the courtroom." This view by Bishop and his subsequent communications of his findings to the rest of the jury occurred at the time when the jury stood five for removing the restrictions and seven

against their removal. It seems obvious that had Bishop not visited the property he well might have joined the five who favored the appellants' cause and thereby, if not accomplishing at least a stalemate, resulting in a new trial for the appellants, he may have swayed those jurors favoring the appellees' contentions to the cause of the appellants. This, because we believe that Bishop's testimony and that of the other jurors, marks him as a very aggressive, determined and persuasive man and although, as hereinafter stated, we are of the opinion that other errors, combined with the misconduct of Bishop would ordinarily require a reversal of the case, we are of the opinion that Bishop's conduct, with its probable effect on himself and the rest of the jury, would of itself require a reversal but for the reasons stated in the appellees' 6th counterpoint, for if one juror only is guilty of material misconduct resulting in probable harm to the appellants, the verdict should not stand. We hold juror Bishop to be guilty of gross misconduct which may very probably have deflected his vote and those of other jurors. Whitehead v. Texas & Pacific Ry. Co., Tex.Civ.App., 84 S.W. 2d 779; Texas Electric Railway Co. v. Wooten, Tex.Civ.App., 173 S.W.2d 463 and Texas & Pacific Ry. Co. v. Gillette, 125 Tex. 563, 83 S.W.2d 307.

Regarding the conduct of juror Langford, jurors Parrish, Baird, Crawford, Bishop and Langford testified respectively:

Juror Parrish: "Langford said that he told us he had looked at the property and that in his opinion they could live there. He said that those two corner lots you could get your car in and out without getting on Timberlane Drive from where they lived— the two corner lots. He said that from his inspection the conditions out there were suitable for a homestead. Q. Was that information conveyed in the form of that it had been determined by a personal inspection? A. I believe it was. That was after the first vote. The best I can remember Langford stated that he drove by there and looked the property over and made up

his mind what could be done with the property, that it was still suitable to live there; that they could use it for a homestead. I wanted to lift the restrictions the first time and changed my vote right along at the last."

Juror Baird: "Well, he said (Langford) that he was so enthused over it and got to studying about it, that he, that evening, I forget what evening it was, he got in his car and went over there and visited around in the community where that property was. He said he went out there in his car and looked it all over, drove around over the property and everything and so when he came back into the juryroom he told us about it. I don't remember that he said anything else about it. He made these statements after the first vote was taken. Q. Did Mr. Langford, following the statement that he had seen the property, give any statement about what the property was fit for or used for or what he thought about it following that statement? A. No, sir, I don't remember if he did. I considered the statement of juror Langford along with the other evidence in the case. I took that statement along with the other evidence that I heard from the witness stand into consideration during my deliberation. That is all Mr. Langford said. He didn't tell what he saw." This occurred after the second vote of the jury when they stood five for removing the restrictions and seven against.

Juror Crawford: "He (Langford) just said that he had went out the afternoon before and had drove around the property and the property in front was worth more money than in the back would be for business property. That was after the first vote."

Juror Bishop: "A. Well, he (Langford) said he believed it looked like it would be a suitable place to live, that he didn't see any reason why they couldn't be able to live out there. I heard him say that he had went by the property and had seen it. Q. Did Mr. Langford say anything about how the

property was located or place any value on it, or what the situation was with regard to it being suitable for homestead? A. Well, I believe there was something said about what the property was worth more now than it was when it was originally purchased."

Juror Langford: "A. I passed by it. I said I passed by it one time. I did pass by it twice because I went to the movie and back. I had to pass by it twice. I don't recall looking at it both times, I probably looked at it going down to the highway. I said I passed by the property and the question was asked us if it was impossible to live there as a residential area and I said I didn't believe it was. I didn't believe it was impossible to live there.

"Q. Well, at least what I am trying to get at was you made the statement that you had gone by the property and then the question was asked and then you expressed the opinion that you thought it was possible for them to live there in the home, is that right? A. That's right. I made the statement loud enough for all the jurors to hear it.

"Q. But you nevertheless did convey the fact to the jury that you had seen the property and following that you expressed your opinion in response to the question the court asked you that you thought it was suitable for home purposes? A. Yes, sir.

"Q. Did you make any statement to the jurors that you thought if they placed any kind of a business establishment on the plaintiff's property that it would jam it up and do damage to the other property, to the defendant's property? A. I believe I did say that.

"Q. And that was after you told them that you had gone by the property that night? A. That's right. I made no inspection of the property as I drove by which was on my normal route. I didn't drive around the property. I didn't make the statement in the juryroom that the situation was not like the evidence showed.

I did make the statement that if there were any kind of commercial establishments on the lots owned by the plaintiffs that it would be too close to the property owned by the defendants and would certainly cause the defendants harm. The photographs accurately portrayed the situation as it existed. I had passed by there many times. Most all of the jurors said that they were familiar with the property before the trial came up."

In connection with the foregoing testimony, it is observed that there is a direct conflict as to whether Langford casually drove by the property as had long been his custom, or whether he made an extensive examination of the same. This conflict was presumably resolved by the trial court in appellees' favor and we are bound accordingly. However, there is no conflict or dispute between Langford's testimony and the other jurors that he did convey his findings and opinion in regard to the condition and the circumstances surrounding the property in dispute, based on his personal experience and observation of the property whether or not it was only a casual examination. This, also, at the time when the jury was divided seven to five as aforesaid. If we must presume that the trial court found this not improper, then we must hold that the trial court clearly abused its discretion in so finding. Barrington v. Duncan, supra.

As to whether or not Langford's testimony and communications to the jury would ordinarily have been harmful to the appellants there is little doubt, for as admitted by Langford himself he first told the jury that he had been by, casually or not, and observed the property; that after this examination he thought the property was still suitable for home purposes; that the removal of the restrictions would result in any kind of business establishments on the appellants' property jamming up and doing damage to that of the appellees. Whether or not this was indeed a fact was a hotly contested issue between the party litigants, and we feel that it is clear, with-out elaboration, that Langford's conduct taken in connection with juror Bishop's, if not alone, prejudiced the appellants' rights to a fair trial on the facts. It appears that the facts in appellants' lawsuit were determined by ten jurors who had hoped to arrive at a verdict strictly on the testimony and evidence adduced before them on the trial, but were hampered and influenced adversely to the appellants by two jurors who were determined that their convictions and private investigations should control.

■ As to appellants' fifth point complaining of the trial court's holding the jurors to be their witnesses and limiting them to the rules applicable to such holding, and further allowing counsel for appellees to examine them under the rules relating to examination of adverse witnesses, we also omit elaboration, stating only that under the circumstances as reflected by the whole record it would appear more proper had the trial court held the jurors to have been neither of the parties' witnesses, allowing cross examination according to the court's understanding and analysis of the demeanor of the individual juror.

■ In connection with the appellees' 6th counterpoint, supra, the facts appear clear and undisputed that each of the appellants, at the very time they purchased their lots had knowledge, or were charged as a matter of law with notice, that all the lots in Block One of the West Eastwood Addition were restricted as aforesaid and that Timberlane Drive was to be widened at the expense of their frontage. They presented their case on the theory that they were entitled to a removal of the restrictions on their lots by reason of changed conditions in the neighborhood. It appears that the case of Bethea v. Lockhart, Tex. Civ.App., 127 S.W.2d 1029, 1032, writ ref., is most analogous to the case at bar, which we quote and adopt:

"'There is no merit in appellant's contention that the restrictions should

not be enforced against it because the streets around this addition have been widened and are important arteries of traffic rendering its property unfit for residential purposes * * *. "It is a matter of common knowledge that boulevards, avenues, and broad highways best suited for the use of vehicles usually traverse suburban areas devoted to and favored for residential uses. To hold that the several broad boulevards and avenues which lead from Los Angeles to the sea have by their increasing travel destroyed restricted residential uses of property along their route would be contrary to both reason and experience." * * *

" 'It is also a matter of common knowledge and accepted human experience that, if the restrictive bars were let down for appellant in this case, the business encroachment on the remainder of the addition would be a matter of gradual yet steady development against which the home owners would be helpless, and the benefits and protection of the restrictive covenants would eventually be lost to all the co-owners therein. This problem arises immediately in connection with the twelve vacant lots scattered through the addition.

" 'The policy of the courts of this state should be to protect the home owners who have purchased lots relying upon, and have maintained and abided by, restrictions, from the invasion of those who attempt to break down these guaranties of home enjoyment under the claim of business necessities.

" 'We adhere to the doctrine that the lot of appellant cannot be considered separate and apart from its relation to the entire restricted addition. Though there may be a fringe of property all around the borders of a restricted addition which would be more valuable for business than for residential purposes, this fact alone is not sufficient to warrant the breach of the restrictions by these owners. * * *

" ' "Those owning property in a restricted residential district or neighborhood, and especially those who have their homes there and have been led to buy or build in such locality by reason of restrictive covenants running with the land imposed upon the street, block, or sub-division in which they have purchased, are entitled to protection against prohibited invasion regardless of how close business may crowd around them on unrestricted property, provided the original plan for a residential district has not been departed from in the restricted district, street, or block and the restrictive requirements have been generally enforced, or accepted and complied with by purchasers." * * *

" ' "The fact that apart from and surrounding the tract some business has grown up, and that the land has become more valuable in consequence, in no manner entitles defendants to be relieved of the restrictions they have created. This condition is but the natural result of the improvement of the various tracts, and the fact that the property may have become more valuable thereby for business purposes is immaterial."

" '* * * "The fact that adjoining or surrounding property is now used for business purposes does not alter the character of the subdivision itself, and the owners of property therein are entitled to have it preserved for the purpose for which it must be assumed they purchased it." ' "

Among other cases supporting the appellees' contention are Benbow v. Boney, Tex. Civ.App., 240 S.W.2d 438, writ ref.; Faubian v. Busch, Tex.Civ.App., 240 S.W.2d 361, writ ref., n. r. e.

■ The appellants have also filed their motion to have certain costs adjudged against the appellees, (T.R.C.P. 377–a) regardless of the outcome of this appeal, alleging generally that their case was brought here only on the above-enumerated points of jury misconduct; that in such connection they had designated and filed herein only such portion of the statement of facts relative thereto at a cost of $80; that thereafter the appellees arbitrarily requested and filed herein all of the testimony, including all exhibits and some of the original evidence, at an additional cost of $255 which appellants asked be adjudged against appellees, since appeal by them was not necessary.

This contention is without merit. This court has found it necessary in determining the probable harmful effect of the above-mentioned jury misconduct to consider the statement of facts before us in its entirety. Much of the matters contained in the statement brought forward at appellees' request was helpful and necessary to us in arriving at our conclusions. The appellees had timely moved for an instructed verdict at the conclusion of all the evidence, setting forth as grounds therefor substantially the matters embraced in their 6th counterpoint aforesaid, and we hold the motions should have been granted and surely the merits of such counterpoint could not have been fairly considered without recourse to a complete statement of facts, for as stated by the Supreme Court in Crawford v. Detering Company, 150 Tex. 140, 237 S.W. 2d 615, 617: "In order to determine the question of whether the statement of juror, Landes, constituted misconduct of a material nature and that probable injury resulted to plaintiff, we deem it necessary to look to the entire record as well as the evidence introduced on the motion for new trial." Also, Barrington v. Duncan, supra.

The motion to adjudge costs against the appellees to the extent of the additional statement of facts aforesaid is therefore refused, and the judgment of the trial court is affirmed.