Joan **AUSLEY**, a feme sole, Appellant,

v.

Robert E. **JOHNSTON**, M.D., Appellee.

No. 6055.

Court of Civil Appeals of Texas,
El Paso.

Jan. 21, 1970.

Rehearing Denied Feb. 18, 1970.

Lynch, Chappell, Allday & Culp, James M. Alsup, Jimmie D. Oglesby, Midland, for appellant.

Kerr, Fitz-Gerald & Kerr, William L. Kerr, Midland, for appellee.

## OPINION

FRASER, Chief Justice.

This is a medical malpractice case in which appellant, Joan Ausley, as plaintiff below, sued appellee, as defendant below, asking to recover damages to appellant as the result of incorrect diagnosis, negligence and incorrect treatment by the appellee.

Appellant claims that appellee failed to examine, diagnose and treat her in accordance with the standards of practice of physicians of his specialty in Midland, Midland County, Texas, and similar communities. The case was tried before a jury and the trial court's judgment is based upon jury findings that judgment should be entered in favor of appellee on every claim asserted by the appellant in the lawsuit; in other words, the judgment was that appellant take nothing.

It appears that appellant, in June of 1965, was involved by a condition which she thought "was, basically, a bladder infection". She went to her long-time Midland internal medicine specialist, Dr. Vincent E. Friedewald. According to the record, she, at that time, was having "burning frequencies and severe pain in the lower part of my stomach and back." After a urinalysis made at the time "didn't show much", urinary antiseptics were prescribed along with antibiotics which were orally administered in tablet form. Further consultation and treatment with and by Dr. Friedewald, according to appellant, did not do her any good. Dr. Friedewald's urinary tests indicated that she had an essentially normal urine at that time. On June 8th, appellant continued making the same complaint, and Dr. Friedewald thereafter referred her to appellee. Appellee became acquainted with appellant on June 15, 1965 at which time she described her condition to appellee and gave him background information including the health of her parents. Appellee prescribed a drug known as "Gantanol" which was calculated to soothe and relax the bladder, and appellant was instructed to call appellee within two days to let him know how she was doing. She called the following day, and on the evening of June 16th went into the hospital. While in the hospital Dr. Carl Ambler, a hospital radiologist, began the first of a number of procedures necessary for an intravenous pyelogram. Appellant was then given a general anesthetic, and while she was asleep appellee performed a systoscopy and uroscopy examination. The record shows that appellee used an instrument to examine the urinary passage of appellant to the urethra from the bladder to the outside, and made other examinations and performed other procedures. Without going into a long and tedious recitation of the testimony of the doctors involved, we will sum up by saying that appellee thought that his June 17th examination of appellant disclosed a condition called interstitial cystitis (Hunner's Ulcer). Appellee thought that this condition accounted for the complaints that appellant was making, and his work with appellant thereafter was designed to cut down her pain and discomfort and relax her bladder. Appellee states that he was certain that while appellant was in the hospital, he, while in her hospital room, discussed with her the result of the examination, and testified that he attempted to explain to her in lay terms about the hydronephrosis that he had found (hydronephrosis, according to prior medical testimony, in this case was a mild hydronephrosis on the left side of the kidney, which meant a slight swelling in the left kidney and ureter.). Appellant remained in the hospital until Sunday, June 20th. Following her release she went to Dr. Johnston probably two or three times. After these visits appellant had "no consultations with or professional advice from" appellee, "nor had he seen her professionally after July 28, 1965". During the 44-day period that appellant

was under the care of appellee, appellee left town on a two-week vacation. During his absence appellant continued to be in pain and consulted another doctor specializing in urology, who advised her to return to appellee for treatment.

On July 28th appellant was catheterized and the urine specimens thus obtained were analyzed and disclosed that appellant's then condition was "essentially normal" and that her then condition was "considered normal". At this last visit appellee gave her a new trial medication called "Enerax 10", which was calculated to help relax the bladder and cut down on bladder discomfort and frequency which, broadly, had been part of the symptoms all along. Appellee states that he did not dismiss appellant on July 28th, but believed that she would let him know one way or the other whether her condition had improved after taking the Enerax trial medication.

After her disassociation on July 28th, appellant returned to her family doctor who placed her back in the hospital where, on September 7th, still another doctor specializing in urology was consulted. After performing additional diagnostic work, Mrs. Ausley, the appellant, underwent an operation in Midland and one at the Mayo Clinic in Rochester, Minesota. It appears that the operation in Rochester, Minnesota was not successful.

■ Appellant's first seven points deal with alleged misconduct of the jury. We feel that these points should be overruled for the following reasons. First, the parties involved are not related to or close friends of any of the jurors, and not one word can be found nor did any individual suggest to a juror what he or she ought to do. We will review these instances briefly. Juror Harrington testified that he was contacted on more than one occasion by a man in the hall of the courthouse during recess periods, and stated that he had known this individual before, but did not describe him as a friend or give his name. The gist of the incident was that this man mentioned to Juror Harrington that appellee was his family doctor; that he was a good doctor and that he thought Dr. Johnston was a real fine man and didn't think the doctor should be sued and up here in the courthouse. The juror further testified that this man approached him four or five times; that he didn't think much about it at first, but finally Juror Harrington stated that he started going downstairs to avoid this individual while getting a coke, and that he, Juror Harrington, would stay down there until it was time for the jurors to come back to the jury room. All of these incidents happened outside of the courtroom. Juror Harrington also stated there was quite a bit said in the jury room about what "preponderance" meant. Appellant claims that it was error because some unidentified juror commented that the term "preponderance" meant the greatest number of witnesses; but the evidence shows that the foreman answered this by reading the court's charge on preponderance of the evidence, and appellant does not try to show that any harm resulted to her from this particular comment. Juror Nance testified that a lady approached him outside the door of the courtroom and told him that appellee was a man of very fine character and a very fine doctor. He further said that she simply walked up and addressed him, made those statements and, in Juror Nance's own words, "I just walked off". Juror Pierce testified to hearing a conversation in a Midland hotel in which he says he heard one fellow say that the doctor seldom loses, or never does, or something like that. He thinks maybe the statement might have been, "He said the doctor never lost a case". Juror Pierce then went on to testify that he knew some of these people, and as long as they were talking about the case he was mindful that the jurors had been instructed not to discuss it, so "I just walked on and didn't say anything to the others." He also said that there was a couple out in the hall; that he had known them for many years, and the lady, a Mrs. Berry, just said, "Well,

Dr. Johnston is a mighty fine doctor". Juror Pierce then testified as follows: "Well, you might say I just walked on". He was asked further if Mrs. Berry told him he was her doctor, to which Juror Pierce replied he was not positive, but he knew they were old friends. Juror Pierce then made the following statement: "Old friends and I don't always agree and, like I say, I walked off". Juror Mrs. Anguish testified that she told a Mr. Allday that if he wished to ask her questions, to call Mr. Youngblood, who was the foreman of the jury, and if he wanted to answer them she would not. It will be noted in all these instances that there was no conversation; that the jurors were merely approached by onlookers or people not connected with the case. To our minds the evidence presents a picture of jurors successfully avoiding doing an improper thing. The trial of the case lasted seven days and it would be only normal for some onlookers or bystanders to pass comments to or in the hearing of the jurors, but there is no evidence here that the jurors made any comments themselves with reference to the merits of the case.

■■■ We have examined the cases cited by appellant, but do not believe they are in point or bear on the matter presently before us. Appellant here seems, in our opinion, to rely only on the overt acts, as we do not find any damaging testimony on the part of the jurors. In other words, the record reveals that the jurors did not reply to or engage in any discussion with anyone on the merits of the case outside of the jury room. There is no evidence that any of these incidents occurred with the knowledge and consent of the defendant or anyone connected with him, and it must be noted that the comments made and discussion overheard did not have any material bearing on the issues involved in the lawsuit, as these issues did not deal with Dr. Johnston being a fine man or a Christian gentleman, etc. There was no request for findings of fact and conclusions of law and, therefore, it must be implied that the judge believed there was no misconduct, or at least no misconduct of a material nature resulting in probable injury to the appellant. The judge obviously took into consideration that the alleged misconduct dealt with matters about which there was no controversy in the case and which had no material bearing on the issues on which the jury was to make its decision. It was necessary for appellant, under these points, to prove that probable injury resulted to her and that the misconduct probably caused the rendition of an improper verdict, as set forth in Rules 327 and 434, Texas Rules of Civil Procedure. Rule 327 governs the requirements for new trials based on jury misconduct, and it is well established that the complaining party must establish under that rule: (1) that such misconduct did in fact occur; and (2) that injury probably resulted to him. Barrington v. Duncan, 140 Tex. 510, 169 S.W.2d 462; City of Houston v. Quinones, 142 Tex. 282, 177 S.W.2d 259. If either requirement is answered in the negative, then the complaining party has not met the burden placed on him by Rule 327. The first requirement is a fact question to be determined from the testimony of jurors and any other competent evidence, including the record as a whole, and the second requirement is a question of law. As above stated, we think appellant failed in this endeavor because she had to rely only on overt acts, as none of the jurors replied to any of the comments or entered into any of the discussion with anyone outside of the jury room. Again we should like to point out that any discussion of the meaning of "preponderance of the evidence" was cleared of harm by the foreman reading the court's charge on "preponderance of the evidence".

For these reasons we believe that the appellant's first seven points should be, and are, overruled.

Appellant's eighth point alleges that the trial court erred in sustaining appellee's objections to leading questions being asked jurors by appellant at the hearing on the motion for new trial. We will review these questions briefly. Juror Harrington was

asked by Mr. Culp: "In other words, you just told us your impression and interpretation of what the person said." The court sustained objection by appellee's attorney to this inquiry, that it was a leading question. Attorney for appellant then asked Juror Nance: "When you were in the jury room and going into the case, did particularly Mr. Gallian take the position with the other jurors that Mrs. Ausley's trouble was partially caused by Dr. Freidewald and Dr. Connery and that, therefore, Dr. Johnston could not be held responsible? Do you recall that?" Again the court sustained appellee's objection that the above constituted a leading question and was therefore improper. Then Juror Nance was later asked: "With respect to the subject, on being discussed in the jury room, the contention that all of Mrs. Ausley's problems were caused by Dr. Friedewald and Dr. Connery, could you tell us who was discussing it?" The court sustained the appellee's objection to this question as leading and subjective. Juror Nance was asked further: "Now, Mr. Nance, state whether or not toward the end of a session, while you were in the jury room, that the jury entered into an agreement that they would not discuss what happened in the jury room with other people?" Again the court sustained the objection to this question on the ground that it was leading. Appellant's attorney asked Juror Pierce the following question: "At any time were the jurors voting in such a manner that about ten of them were voting on the issue for the plaintiff and about one of them for the defendant?" Before the witness could answer, the court sustained the same objection, to-wit, that it was a leading question.

We do not find that this point presents error and feel that it must therefore be overruled. It has long been established that on a hearing on a motion for new trial setting up alleged jury misconduct, the jurors are not the witnesses of either side, and the extent of their cross-examination is a matter largely resting within the discretion of the trial court; and

unless a clear abuse of such discretion is shown, there exists no reversible error. Walker v. Thompson, 287 S.W.2d 556 (Tex.Civ.App., ref. n. r. e.); Snow v. Harding, 180 S.W.2d 965 (Tex.Civ.App., ref. w. m.); Murphy v. Davis, 305 S.W.2d 218 (Tex.Civ.App., n. w. h.). We think the court did not abuse its discretion in this matter, and appellant does not seem to make any attempt to show that the court did abuse its discretion in ruling out the above-mentioned questions. Appellant's Point 8 is overruled.

Appellant discusses Points 9, 10, 11 and 12 as a group. Point 9 argues that a new trial should have been granted because of the insufficiency of the evidence to support the jury's answers to Special Issues 1, 3 and 5, and because such answers are so contrary to the overwhelming weight of the evidence as to be clearly wrong. These special issues, to-wit, 1, 3 and 5, inquire if there was negligence in failing to prescribe additional retrograde pyelograms within three months, three weeks, or between three weeks and three months. Point 11 is to the same effect with reference to Special Issue 22, and Point 12 is to the same effect with respect to Special Issue No. 14. Point 10 charges that the trial court erred in failing to have read to the jury the testimony of Dr. Dillon, Dr. Connery and Dr. O'Heeron.

With the exception of Point 10 we will, of course, consider the testimony in evidence here under the doctrine laid down in the case of In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, which has been consistently followed since its rendition and which requires us to consider and weigh all of the evidence in the record and set aside the verdict and remand the cause for a new trial if we conclude that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust. We have carefully considered the record here and do not find that the answers of the jury are in conflict with the rule laid down in In re King's Estate, supra. Several doctors, including the defendant,

testified at length as to what they would have done, and what was done, on the basis of the evidence submitted to them regarding the diagnosis and treatment of the patient by the defendant. The record reflects that when the appellant first saw Dr. Johnston, her symptoms were confined to her bladder, and none were referrable to her kidneys. In fact, she described her own condition as a bladder condition, and examination revealed a bladder condition called 'interstitial cystitis", also known as "Hunner's Ulcer"; and, although a mild hydronephrosis was found to exist in her left kidney, she had no symptoms referrable to kidney function. It must be remembered that the appellant was a patient of appellee for only 44 days, and appellee testified that he found nothing to indicate that the mild hydronephrosis was of recent origin, and he believed that it was probably likely related to female surgery performed on appellant in 1959. Appellee further testified that a person with a mild hydronephrosis can stay in that same state for years, or possibly for the rest of her life. Also, that when a person has kidney problems, it is normally expected that he will have pain in the kidney area, and this would be true if a mild hydronephrosis were progressing into a more serious hydronephrosis. Defendant made no note that appellant made any complaints about any pain in the kidney area, and further testimony brings out that the symptoms she had in September of 1965 did not resemble those she had while being treated in June and July of 1965 by the appellee. Appellee testified that throughout the time he saw appellant as a patient, all the symptoms she had were related to the bladder, and that the finding of the interstitial cystitis explained those symptoms and that he treated her for those bladder symptoms and she seemed to improve. Appellee further indicated that with a mild hydronephrosis you would check it again in three months or so, depending on your experience, such condition, and on the patient's symptoms that could be attributed directly to the kidney, and that a prudent urologist would not necessarily tell his patient at the time of the diagnosis of a mild hydronephrosis that she needed to have another pyelogram run at a future date. A Dr. O'Heeron testified that with a mild hydronephrosis the period of time within which a pyelogram examination should be done would vary between three and six months, and he would wait at least three months. A Dr. Dillon testified that if he found such a condition, he would "let it ride for a while" and that he would attach some significance to the fact of the patient having had a previous hysterectomy, and that knowing the cause of the condition, then he would let it go longer than if he didn't. The record shows that when appellant consulted Dr. Friedewald on August 11, 1965, she had no genito-urinary complaints and no complaints about any condition in or around her urinary tract. It is argued that this fact is indicative of a cure or remission of the Hunner's Ulcer, and it is argued that appellee, having treated appellant for such, and appellant being relieved or cured, she would have no reason to seek additional treatment from appellee. On the contrary, appellant thought on August 11, 1965 that her stomach ulcer was coming back and that Dr. Friedewald diagnosed a duodenal ulcer at that time. Appellant apparently made no effort in August to indicate a need for, or consult with, a urologist. The jury, in response to Special Issue 22, found that Dr. Johnston had not failed to perform sufficient non-retrograde pyelogram urological tests to determine the cause of her condition, and appellant, in her brief, does not contradict this finding, which we believe is supported by the testimony.

■ With reference to Point 10, we find no error as the jury, after sending in a request to have re-read to them the testimony of Dr. Dillon, Dr. Connery and Dr. O'Heeron, withdrew the request. Such request was withdrawn after the judge had properly instructed the jury with regard to their request. Therefore we find no error in this point and it is accordingly overruled.

With reference to Points 9, 11 and 12, we have carefully examined the record and briefs of the parties and find that the jury's answers to these issues were not against the great weight and preponderance of the evidence so as to be improper, but were, in fact, substantiated by the evidence. These points are accordingly overruled.

Appellant's Points 13 and 14 charge that the trial court erred in refusing to grant a new trial because of insufficiency and/or no evidence to support the jury's findings relating to causative negligence issues and the damage issues in the court's charge to the jury, maintaining that such findings are so contrary to the overwhelming weight of the evidence as to be clearly wrong. While we have discussed some of these matters earlier in this opinion, we deem it necessary to answer these points by appellant. Special Issues 1, 3 and 5 inquire if there was negligence in failing to prescribe additional retrograde pyelograms within three months, three weeks, and between three weeks and three months; and Special Issue 14 asks if there was negligence in failing to request a return for further treatment. As heretofore stated in this opinion, appellant came to appellee complaining of a bladder condition, and as heretofore set forth, tests were made and medication and treatment provided for such condition. At the time, appellee did notice a slight swelling of the left kidney and suspected that it was a result of a prior hysterectomy. Appellee's diagnosis shows that appellant was suffering from what has been described as Hunner's Ulcer, which is a bladder condition sometimes called interstitial cystitis. Appellee testified that the tests run on appellant while she was in the hospital indicated there was good functioning of the kidneys during the time he saw her, and that he found nothing in an examination of appellant to indicate that the mild hydronephrosis was of recent origin, and, as stated before, he believed it most likely related to some female surgery performed on appellant in 1959. He further testified that

a mild hydronephrosis, if found, does not mean that this is a condition which will automatically get worse, but is a condition that can absolutely stay in the same state for years, or perhaps the rest of the life of the patient. If this condition does become aggravated, then kidney symptoms and kidney problems appear and would indicate that the mild hydronephrosis was progressing into a more serious one; but appellee testified that appellant had made no complaints concerning pain in the kidney area and, if she had done so, he would have made a notation in his records; and that there was nothing that occurred during the time she was his patient to indicate that the kidneys were going from a mild hydronephrosis to any other condition, or that she had or was developing retro-peritoneal fibrosis. Appellee describes symptoms of this particular malady and testified that he saw no such change or symptoms in appellant. The record also indicates that the symptoms appellant had in September of 1965 did not resemble the symptoms she had in June, 1965, when she first went to appellee for treatment, and that throughout the time (44 days) that she was in appellee's care, all the symptoms she had were related to the bladder, for which appellee treated her and stated that she seemed to improve. Appellee further testified that where the doctor finds a mild hydronephrosis, he would normally check it again in three months or so depending on his experience with this particular disease and on the patient's symptoms that could be attributed directly to the kidney. He made it very plain that a prudent urologist would not necessarily tell his patient at the time of diagnosis of a mild hydronephrosis that she needed to have another pyelogram run at a future date. His testimony indicates that he would not tell her this unless she had kidney symptoms and pains, or some kidney indications that the hydronephrosis was getting worse. Dr. O'Heeron testified that with a mild hydroi ;phrosis, the period of time in which another pyelogram examination should be done varies between three and six months, and he would wait at least

three months. It will be remembered that in less than that time, to-wit, August, 1965, appellant went back to her family doctor, who diagnosed and tested her for stomach or duodenal ulcer, but that she never returned to Dr. Johnston, the appellee, after July 28, 1965. Dr. Dillon testified that if he found a condition of mild hydronephrosis, he would "let it ride for a while" and that he would attach some significance to the patient's having had a previous hysterectomy. Dr. Connery testified he would run another pyelogram in three weeks after the June 17th examination. It is clear from the record that while appellee did not ask appellant to return for further examination and treatment, he did, on July 28th, give her a trial medication, and that it is his practice in such cases to have the patient let him know whether this trial medication improved or did not improve her condition. He states flatly that he did not dismiss the appellant. The record also shows that in response to Special Issue 22, the jury found that appellee had not failed to perform sufficient non-retrograde pyelogram urological tests to determine the cause of her condition. Appellant does not present any evidence to the contrary and, in fact, the testimony supports the jury's findings. With reference to appellant's points objecting to the damage issues submitted to the jury, these points necessarily must be, and are, overruled, as the jury found the appellant not guilty of any negligence. We think no further discussion is necessary relative to these points, as we have gone into them more than thoroughly, and the record indicates that there is sufficient evidence for the submission of and answers to Special Issues 1, 3, 5 and 22. These points are overruled.

Appellant's Point 15 charges that the court erred in failing to instruct the jury that there can be more than one proximate cause of an event. We find no error in this point as the record shows that appellant waived her assignment of error by virtue of the fact that she requested a definition of proximate cause which included the quoted words within it. The court used a different definition, to which appellant neither objected nor filed any objection to the failure of the court to give the charge suggested by appellant. In fact, the requested definition was never filed with the court. Objection is the proper mode for presenting a complaint for failure to charge that there can be more than one proximate cause of an event. This objection should be filed to the court's charge. Such was not done here, and we hold appellant to have waived objection to the omission of the said words. As stated above, appellant made no objection to the court's failure to give the suggested charge which did contain the matters about which appellant complains. We see no error shown by this point, and same is overruled.

Appellant's Point 16 charges error in the court's charge in allowing appellee separate submission of issues inquiring as to new and independent cause and in its definition of "proximate cause". This point is overruled because it has been held that where there is evidence tending to show the existence of a new and independent cause, the definition should be submitted. Phoenix Refining Co. v. Tips (Comm.App.1935), 125 Tex. 69, 81 S.W.2d 60; Young v. Massey (1937), 128 Tex. 638, 101 S.W.2d 809. Even though it seems repetitious, it must be recalled that there was doubt that appellant had the injurious condition of retro-peritoneal fibrosis at the time she was the appellee's patient, and this is further supplemented by the evidence that after she had severed her relationship with Dr. Johnston, she had an onset of some disease in August or early September, and it will be remembered that her family doctor diagnosed her trouble then as a stomach or duodenal ulcer of some sort. This point is overruled.

Appellant's Point 17 claims there was not sufficient evidence to support the submission of Special Issue 48, which inquired whether an alleged failure of appellant to secure appellee's advice was a new

**360**

and independent cause of her injuries or the jury's answers thereto. There was nothing to prevent appellant from further consultation with appellee after July 28, 1965. This point, in one form or another, has been thoroughly discussed. We find no error in it, and it is accordingly overruled.

Appellant's Point 18 charges that there was not sufficient evidence to support the submission of Special Issue 51, which inquired whether an alleged failure of appellant to have surgery was a new and independent cause of her injuries. We think this full and voluminous record justified the submission of and answer to the issue complained of, and this point is therefore overruled.

Appellant's Point 19 charges that the jury's negative answer to Special Issue 21, which inquired whether appellee's representations to appellant that she need not be running to other doctors, is so against the great weight and preponderance of the evidence as to be manifestly unjust. We do not find support for this point in the record, and it is therefore overruled.

Appellant's Point 20 complains that the trial court erred in its submission of Special Issue 48, inquiring whether a failure of appellant to see appellee and secure his advice was a new and independent cause of her injuries, because such issue was worded prejudicially, assumes such failure on the part of appellant, and constitutes an unfair comment by the court on the weight of the controverted evidence. We overrule this point, as we do not find such error in the court's charge.

Appellant's Point 21 complains that the trial court erred in submitting Special Issue 50, inquiring whether appellant's condition was caused by "unspecified acts of nature and acts which defendant did not control", because such issue is not a controlling or ultimate issue, is multifarious and global, and constitutes an unfair comment by the court on the weight of the

evidence. We see nothing wrong with this issue as submitted, and this point is therefore overruled.

Appellant's Point 22 states that the court erred in submitting Special Issue 53, inquiring whether appellant's condition is not the result of an "unavoidable occurrence", and its definition of that term, because such issue and definition are violative of the special issue practice of this state, and therefore constituted an improper general charge. We cannot agree with appellant's contention and therefore overrule this point.

Appellant's Point 23 states that the trial court erred in submitting Special Issue 53, inquiring whether appellant's condition is not the result of an unavoidable occurrence, because there was not sufficient evidence to support its submission or the jury's answer thereto. We must overrule this point as we find no error in the court's submission of said issue based on the record before us.

Appellant's Point 24 charges that the trial court erred because it refused to include appellant's requested Special Issues 54, 55 and 56 in its charge, such points relating to appellant being misled by appellee into believing that her only illness involved a condition of the bladder and that she should not be concerned about any disease of the kidneys. The record shows that these issues were first tendered and then withdrawn by appellant at the time the court's charge was being finally prepared. After the charge was prepared in final form, and during the time the appellant was orally stating objections to the charge, appellant's counsel decided to go ahead and tender what had been taken back, but a copy of these issues did not appear anywhere in the court's file or among the records of this case until the bill of exceptions was filed after the motion for new trial was overruled. Also, we do not think the record justified the submission of these issues and find that

the court properly refused to do so. This point is accordingly overruled.

■ Appellant's Point 25 states that the trial court erred in overruling appellant's amended motion for new trial because the cumulative effect of all the matters complained of in appellant's motion for a new trial resulted in prejudice to her right to receive a fair trial. We find no merit in this point as it is merely a summation of all the merged errors which have heretofore been discussed and disposed of. This point is therefore overruled.

■ Special Issues 42, 43, 44, 45, 46 and 47, as set forth in appellant's Points 13 and 14, were damage issues, each asking about damage amounts appellant had sustained or would sustain as "a direct and proximate result of the omission and/or acts of the defendant". We do not discuss these because the jury found no negligence on the part of the appellee, resulting in the jury verdict of "None".

Appellant's points are all overruled and the decision of the trial court is affirmed.